# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-03-00645-CV

Wendy Lashay Ward, Appellant

v.

Texas Department of Protective and Regulatory Services, Appellee

FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 119TH JUDICIAL DISTRICT
NO. B-02-0092-J, HONORABLE RAE LEIFESTE, JUDGE PRESIDING

# M E M O R A N D U M   O P I N I O N

Appellant Wendy Lashay Ward appeals the district court's final decree terminating her parental rights to her son A.D.P. for failure to comply with the provisions of a court order specifying actions necessary for Ward to obtain the return of A.D.P., who was in the temporary managing conservatorship of the Texas Department of Protective and Regulatory Services ("the Department") for at least nine months as a result of his removal for abuse or neglect. *See* Tex. Fam. Code Ann. § 161.001(1)(O), (2) (West 2002). Ward challenges the factual sufficiency of the finding that termination of the parent-child relationship was in the child's best interest.[1] We will affirm the trial court's judgment.

---

[1] The district court also terminated the parental rights of Tyrone Williams, A.D.P.'s natural father, but only the termination of Ward's rights is at issue in this appeal.

## BACKGROUND

Ward is the natural mother of A.D.P., who tested positive for marijuana when he was born on September 4, 2001. The Department has been involved in A.D.P.'s life since September 2001 when it investigated allegations of abuse and neglect stemming from A.D.P.'s positive test results. The Department found that Ward had used drugs during her pregnancy, that she was on probation for unauthorized use of a motor vehicle, and that she was unemployed and living with her grandparents, upon whom she depended for the substantial assistance she needed to care for A.D.P. The Department concluded that A.D.P. was at risk and instituted a Family Based Safety Services (FBSS) case offering services to help Ward with stability and parenting issues. During the FBSS case, Ward continued to live mainly with her grandparents, the Duffys. Despite her failing health, Mrs. Duffy became A.D.P.'s primary caretaker.

In December 2001, Ward obtained assisted Housing and Urban Development (HUD) housing at the Department's request, leaving A.D.P. with the Duffys.[2] On December 14, 2001, Ward married Paul Ward. Mrs. Duffy's health continued to deteriorate, preventing her from being able to safely continue to care for A.D.P. On the Department's advice and following a home study, Ward voluntarily placed A.D.P. with his maternal great uncle and great aunt, the Pyles, in Victoria, in early January 2002 when A.D.P. was four months old.[3]

---

[2] The Department's safety plans for A.D.P. mandated that Ward not take him out of his home with the Duffys without the Duffys' permission or after certain hours because the Department determined that Ward had been taking A.D.P. for extended periods of time without giving him adequate care or protecting him from dangerous situations. Ward did not comply with this plan. She did eventually obtain HUD housing as the Department had urged, but by that point in time the revised safety plan prohibited her from taking A.D.P. with her.

[3] Ward last had in-person contact with A.D.P. on January 11, 2002.

Ward violated the Department's service plan requirements by failing to use offered services, engaging in criminal activity, violating her probation, and taking A.D.P. from the care of the Duffys without permission. She also threatened and attempted to take A.D.P. from his voluntary placement with the Pyles when she left San Angelo to move to Rockport on April 2, 2002.[4] In April 2002, the court named the Department A.D.P.'s temporary managing conservator and appointed a court-appointed special advocate (CASA) and an attorney ad litem for him. It continued his placement with the Pyles and formulated a family service plan requiring A.D.P.'s parents to attend counseling, stabilize their lives, and demonstrate parenting skills to obtain A.D.P.'s return. The record shows that Ward has not satisfied the requirements of this plan.

Ward was arrested on April 12, 2002 in Rockport and convicted of 12 counts of burglary of a habitation. She has been incarcerated since then and is expected to remain incarcerated until 2007.[5] Ward has at least minimally availed herself of services such as drug treatment, counseling, and parenting classes while incarcerated.

The Department sought to be named permanent managing conservator and to have Ward's parental rights terminated. Following a trial, the district court terminated her rights on

[4] When Ward moved to Rockport, she was still on probation in Tom Green County for unauthorized use of a motor vehicle. She violated her probation by leaving without notifying her probation officer or obtaining permission. Ward's arrest in Rockport and incarceration in Aransas County for burglary delayed legal action against her concerning the revocation of her earlier probation.

[5] The 2007 estimate comes from the testimony of CPS Specialist Anthony Rastetter, who relied on representations from the Aransas County District Attorney's office. If Tom Green County pursues its case against Ward, he estimates that she could be incarcerated until as late as 2009. According to Ward's testimony, if Ward is paroled, she may have been released in October 2003; if not, she expects to be out in October 2005. The record does not indicate Ward's current status.

3

September 8, 2003. Ward appeals, arguing that the evidence was factually insufficient to support the district court's finding that termination was in A.D.P.'s best interest. Ward is not seeking custody in this case; she wishes to be named possessory conservator with rights to A.D.P.

## DISCUSSION

Parental rights may only be terminated if the Department proves and the trial court finds by clear and convincing evidence: (1) that the parent has engaged in conduct set out as statutory grounds for termination and (2) that termination is in the best interest of the child. *See* Tex. Fam. Code Ann. § 161.001 (West 2002). In this case, the statutory grounds for termination are that Ward failed to comply with court orders directing how she could have A.D.P. returned to her from Department conservatorship. *See* Tex. Fam. Code Ann. § 161.001(1)(O) (West 2002). The Department must prove both statutory prongs by clear and convincing evidence; proof of one prong does not excuse it from establishing the other. *Holley v. Adams*, 544 S.W.2d 367, 370 (Tex. 1976). Clear and convincing evidence is that measure or degree of proof that produces in the mind of the trier of fact a firm belief or conviction of the truth of the allegations sought to be established. *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002) (citing *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979)). This heightened standard of proof is appropriate because termination is a drastic remedy of such weight and gravity that due process requires the state to justify termination of the parent-child relationship by more substantial proof than a preponderance of the evidence. *Id*. (citing *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980)); *see also Santosky v. Kramer*, 455 U.S. 745, 747-48 (1982) (requiring that in termination cases "the State support its allegations by at least clear and convincing evidence"). Parental rights are of constitutional magnitude, but they are not absolute. *In re C.H.*,

4

89 S.W.3d at 26. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that the emotional and physical interests of the child not be sacrificed to preserve that right. *Id*.

Ward argues that the court abused its discretion in making the finding that termination was in the best interest of A.D.P. because the evidence the Department presented was not such that a fact finder could reasonably form a firm belief or conviction about the truth of that allegation. Termination findings must be upheld against a factual sufficiency challenge such as this if the evidence is such that a reasonable fact finder could form a firm belief or conviction that grounds for termination exist.[6]  *C.H.*, 89 S.W.3d at 18-19. In making this determination, we give due consideration to evidence the fact finder could have found to be clear and convincing and consider whether disputed evidence is such that a reasonable fact finder could not have resolved the dispute in favor of its finding. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

Although proof of one of the grounds from section 161.001(1)[7] does not relieve the Department from proving termination is in the best interest of the child, the same evidence may be probative of both issues. *C.H.*, 89 S.W.3d at 28 (listing father's inability to care for child from prison, pattern of conduct "inimical to the very idea of childrearing," failure to provide emotional

---

[6] This departs from the traditional factual sufficiency review, in which the court determines whether a finding is so against the great weight and preponderance of the evidence that it is manifestly unjust; the supreme court has held that the traditional standard is inadequate in parental termination cases because they require that findings be based on clear and convincing evidence. *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002) (citing *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)).

[7] Section 161.001(1)(A-S) lists numerous grounds upon which parental rights may be terminated, but section 161.001(2) requires that termination also be in the best interest of the child. Tex. Fam. Code Ann. § 161.001(West 2002).

or financial support to child, criminal history continuing past child's birth, and lack of concrete plan to care for child as factors probative of best interest question). Factors to consider in determining the best interest of a child include (1) the desires of the child, (2) the present and future emotional and physical needs of the child, (3) the present and future emotional and physical danger to the child, (4) the parenting abilities of the parent seeking custody, (5) the programs available to assist the parent seeking custody, (6) the plans for the child by the parent or agency seeking custody, (7) the stability of the home or the proposed placement, (8) any acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *Holley*, 544 S.W.2d at 371-72. This list is not exhaustive; other factors may be considered if appropriate. *Id*. at 372. Likewise, a fact finder is not required to consider all the listed factors in coming to a finding that termination is in a child's best interest. *Id*. That is, absence of evidence regarding some of the factors would not prevent a reasonable fact finder from forming a strong belief or conviction that termination is in the child's best interest. *C.H.*, 89 S.W.3d at 27. This test focuses on the interest of the child, not the needs or desires of the parent. *See In re J.O.C.*, 47 S.W.3d 108, 115 (Tex. App.—Waco 2001, no pet.).

We now turn to the *Holley* factors[8] to determine whether the evidence was sufficient that the trial court could reasonably have formed a firm belief or conviction that termination was in A.D.P.'s best interest.

---

[8] Because of A.D.P.'s tender age and inability to express his preference and because we find the other factors sufficient, we do not examine the first *Holley* factor, the desires of the child.

*The present and future emotional and physical danger to the child.*

CPS reports in evidence indicate that Ward has put A.D.P. in danger by keeping him out late with friends, failing to maintain supplies of formula or diapers when taking him out, losing him under the covers of a bed, attempting to engage in a fistfight with him in her arms,[9] failing to properly administer medicines to him when he was ill, and not having A.D.P. in a car seat while driving.[10] CPS Caseworker Heather Cress stated in her affidavit that, during A.D.P.'s first months, Ward was seldom at home to care for him and that Cress was therefore not often able to meet with Ward. Although Ward herself did not care for A.D.P., Cress noted that Ward insisted that A.D.P. not go to Department-arranged protective day care, but stay with Mrs. Duffy, who suffered from diabetes, partial blindness, and heart problems leaving her at constant risk of a heart attack or stroke and who had been prohibited from engaging in strenuous activity by physicians. These events all occurred during A.D.P.'s first four months; Ward testified that she has not seen A.D.P. since he was placed with the Pyles in January of 2002.

This evidence could suggest to a reasonable fact finder a past pattern of behavior indicating that if Ward retains parental rights and access to A.D.P., he may continue to be in physical and emotional danger in the future. There is other evidence that she might put A.D.P. in future

---

[9] This incident occurred during the night while Ward and A.D.P. visited a friend of Ward's. Another woman had taken A.D.P. from Ward's bed while Ward slept at a friend's house where they were spending the night and had carried him across the street to meet his alleged father without Ward's knowledge. When Ward awoke to find A.D.P. gone, she went looking for him, retrieved him from the woman, and attempted to fight her.

[10] CPS Caseworker Heather Cress's affidavit, all her reports to the court below, and the report from A.D.P.'s Court Appointed Special Advocate (CASA), Shonda Payne, which were admitted as exhibits, recite these facts.

danger as well if she had access to him. When Ward was evicted from HUD housing where she lived with her husband,[11] Cress described the apartment as filthy and unhealthy in sworn reports to the court. Although Ward points out that A.D.P. never lived in that apartment or with her husband, a reasonable fact finder could form a firm belief or conviction that Ward has shown she is not able to provide a safe and appropriate environment for her son.

Ward argues that because A.D.P. would remain in his current placement, he would be safe from any danger. However, she attempted to remove him from that very placement in April of 2002,[12] shortly before she moved to Rockport, committed several counts of burglary of a habitation, and was incarcerated. Had she succeeded in taking him, the court could reasonably have found that he would have been placed in emotional and physical danger, and the evidence is such that the court could have formed a firm belief that such danger would continue in the future.

*The parenting abilities of the parent seeking custody.*

Although Ward claims she only wishes to be named possessory conservator, there is evidence that her parenting abilities are lacking and that she is not able to care for A.D.P. even during short-term visits with him. Cress testified that Ward never learned how to properly care for A.D.P. and has never been responsible for making sure he is fed, cleaned, dressed, provided for, or cared for when ill. Cress relayed complaints from the Duffys that Ward did not administer medicine

---

[11] Payne reported that a review of the Department's files indicated that Ward's current husband has been accused by his minor nephews of sexual abuse. Ward testified that she plans to divorce her husband after she is released from prison.

[12] Cress avers in her affidavit in evidence that Ward stopped on her way from San Angelo to Rockport and called the Pyle home at 4 a.m. on April 2, proposing to pick A.D.P. up while she was in Victoria. The Department's conservatorship began on April 2, 2002.

to A.D.P. when he was ill, did not allow him to sleep, never washed his clothes or cleaned his bottles, did not get up with him when he cried at night, and did not show interest in holding or interacting with him. Cress's reports describe Ward as "in crisis daily" and unable to keep commitments or deal with everyday problems without making them into a crisis.

Although Ward argues that her time in prison has forced her to grow up, her past performance as a parent has a bearing on her fitness and ability to care for her child in the future. *See C.H.*, 89 S.W.3d at 28; *D.O. v. Texas Dep't of Human Servs.*, 851 S.W.2d 351, 356 (Tex. App.—Austin 1993, no writ) (considering past conduct as evidence of future inability to care for child). Cress's and CPS Specialist Anthony Rastetter's reports, which the court admitted as exhibits, all asserted that Ward made no progress from A.D.P.'s birth to the time of the termination hearing.

*The programs available to assist the parent.*

The Department has attempted to assist Ward by making referrals and appointments to obtain assistance from the Texas Workforce Commission (TWC) for job search assistance, Cantu Counseling Services and John Wiley for individual counseling, and Jim Gonterman for drug and alcohol counseling. None of these programs succeeded in helping Ward make progress in taking care of A.D.P. or stabilizing her own life. Cress's reports to the court indicated that, although TWC helped Ward get a car and pay for gas, Ward did not take advantage of TWC services to find a job; employers Ward claimed to have contacted seeking work told Cress they knew nothing about Ward. The Cress exhibits reported that Ward began giving rides for money although she had no driver's license or insurance. Although Cress arranged for individual counseling with John Wylie for aggression, violence, parenting, and stress issues and substance abuse counseling with Jim

9

Gonterman, Wylie testified that Ward attended only one counseling session with him and missed several others, including sessions that Ward and Wylie arranged to occur at Ward's residence. Gonterman testified that Ward attended two appointments, failed to show up three times, then missed all further appointments, although he continued to attempt to schedule them. Gonterman testified that, from his contact with Ward, he believed that Ward blamed others for her difficulties and was unwilling to examine her own behavior's contribution to creating her problems.[13] Ward did not complete individual counseling or parenting classes, nor did she complete group therapy for substance abuse as required by her probation, because she was disruptive during sessions and was asked to leave, according to a report by Cress.

Public assistance in the form of WIC, TANF, Medicaid, food stamps, and HUD has also been made available to Ward. Cress's affidavit stated that Ward misused these resources by misappropriating funds intended for A.D.P. and by returning items bought through WIC and food stamps, such as milk and diapers, for cash. Her alleged abuse of Medicaid and food stamps led to those services being discontinued, according to reports from Cress. Cress reported that Ward eventually obtained housing through HUD, though Ward had initially delayed completing the HUD paperwork, and she had been evicted from HUD housing and had lost her phone and car by March 2002, when she called Cress asking for money.

---

[13] Other evidence corroborates Gonterman's assessment. Wylie testified that Ward blamed Mrs. Duffy for her problems with the Department concerning A.D.P. when she spoke with Wylie. A letter from Ward admitted at trial blamed Cress for Ward's problems keeping her son and alleged that Cress harbored personal animosity against Ward.

In prison, Ward has had much more limited access to services to assist her. Rastetter testified that Ward has not documented participation in any programs while in prison. However, Ward testified that she participated in Ark Parenting class, that she is receiving psychological care and counseling, that she began a program called "Changes" shortly before the termination hearing, and that she participated in about eight months of a nine month drug treatment program before she was ejected from it.[14]

In sum, Ward has had many services available to assist her, but there is evidence that she has abused many of the services and is unwilling or unable to take full advantage of these resources.

*The plans for the child by the parent or agency seeking custody.*

Ward seeks to be named possessory conservator of A.D.P. only, which would give her visitation rights and obligate her to pay child support. Although she claims she will support A.D.P.'s continuing to live with the Pyles, she has formerly threatened to disrupt his life by removing him from his placements. Cress reported to the court that Ward threatened the Duffys and took A.D.P. from their care without permission on several occasions, and Diana Pyle testified that Ward has called the Pyle home threatening to remove A.D.P. Pyle testified that, in April 2002, Ward

---

[14] When Ward was arrested for burglary, she was sentenced to nine months at a Substance Abuse Felony Punishment (SAFP) facility for a drug treatment program followed by three months at a halfway house and probation. *See* Tex. Gov't Code Ann. § 493.009 (West 2004) (Substance Abuse Felony Punishment Facilities). In her testimony Ward admitted that she was expelled from the SAFP program without successfully completing it because she did not comply with its requirements. The failure to successfully complete SAFP led to Ward's being incarcerated for four years and shows her inability to do what is necessary to be released from prison and make herself available to care for her child.

11

actually came to Victoria from San Angelo and called her home at 4 a.m. seeking A.D.P. Although Ward testified that there is currently no animosity between her and the Pyles and that she believes they give A.D.P. a good home, she also testified that, if paroled, she would return to live in San Angelo with her grandfather, Mr. Duffy, and would eventually take A.D.P. back to the Duffy home.[15] In letters to the Department, Ward complained that the Pyles were trying to take her son from her and asked that he be removed from the Pyles and placed with Ward's mother or aunt in San Angelo because the Pyles did not allow Ward or other relatives enough contact. It is unclear that, if given an option, Ward would leave A.D.P. in his current placement. The court could have reasonably believed that Ward's intention to take A.D.P. to live with her has not changed.

Rastetter testified that the Department seeks permanent managing conservatorship of A.D.P. so it may consent to his adoption by the Pyles. Diana Pyle testified that they are interested in adopting A.D.P. and raising him to adulthood. Rastetter and Payne have observed that the Pyles treat A.D.P. as a member of their family and that he has a permanent, stable home with them. Diana Pyle testified that she considers him an integral part of the family, "just like my daughter." The government has a compelling interest in establishing a stable, permanent home for a child. *In re M.A.N.M.*, 75 S.W.3d 73, 77 (Tex. App.—San Antonio 2002, no pet.). The evidence indicates that adoption by the Pyles would be a stable option for A.D.P.

*The present and future emotional and physical needs of the child.*

The need for permanence is a paramount consideration in evaluating a child's present and future emotional needs. *M.A.N.M.*, 75 S.W.3d at 77. A.D.P.'s relationship with his mother has

---

[15] Mrs. Duffy is now deceased.

12

been characterized by fluctuation and uncertainty. She has not only changed residences several times since his birth, she has also attempted to remove him from his primary caregivers multiple times, and she and her husband have burglarized multiple homes, leading to her incarceration.

Reports from Cress and Rastetter, based on their own observations and history from Ward's family members, indicate that Ward has never taken the opportunity to care for A.D.P. herself, nor has she ever learned how to care for him.[16] Ward has not demonstrated that she is even able to care for herself. Cress reported that, before Ward was evicted from her HUD apartment, Cress visited that home and found it extremely unsanitary; Cress reported that Ward admitted that she was infested with lice. Ward testified that she was unable to keep the appointments the Department made for her because she forgot them, they were too close together, or she was doing too much at one time, even though she has not held a job for most of A.D.P.'s life and his primary care has always been handled by Mrs. Duffy or Mrs. Pyle. A.D.P.'s CASA, Shonda Payne, reported that she also believes that Ward is incapable of caring for A.D.P.

Also, it is undisputed that Ward has been incarcerated for the majority of A.D.P.'s life and cannot meet any of his needs from prison. Current and future incarceration of parents is relevant to their ability to meet a child's present and future physical and emotional needs. *In re M.D.S.* 1 S.W.3d 191, 200 (Tex. App.—Amarillo 1999, no pet.); *In re N.K.*, 99 S.W.3d 285, 300-01 (Tex. App.—Texarkana 2003, no pet.) (noting that parent on community supervision with history of crime and drug use was likely to be re-incarcerated in future and could thereby endanger child).

---

[16] Evidence indicates that this may be due in part to Ward's limited contact with A.D.P. Cress reported that her grandparents complained that she was seldom home to interact with A.D.P when she lived with them, and her visits were few and short after she moved out.

Although Ward testified and has expressed in letters that she loves and wants A.D.P., the court could reasonably have found that she is not able to meet his physical and emotional needs. Ward argues that, although she is not able to meet A.D.P.'s emotional or physical needs, someone else always has; that is, A.D.P. has never gone homeless, unfed, or uncared-for. However, the trial court could have found that the fact that A.D.P. has fared well with relatives without Ward's interference, combined with his need for permanence, militates in favor of allowing his present caregivers to adopt him.

*The stability of the home or the proposed placement.*

The Department proposes to continue A.D.P.'s placement with the Pyles. The Department conducted two home studies of the Pyles' home and both indicated that it was a loving, stable, secure environment, and that the Pyles are good parents who have a stable marriage and the physical, financial, and emotional resources to properly care for A.D.P. Rastetter and Mrs. Pyle both testified that A.D.P. was secure, happy, and thriving in his current placement. Rastetter's December 2002 progress report indicated that A.D.P.'s placement with relatives was a safe and appropriate family environment where his physical, emotional, and developmental needs were consistently met. He also noted that A.D.P. was bonding with the Pyles.

Mrs. Pyle testified to the bond between A.D.P. and the family and opined that, because she, her husband, and their daughter are the only family A.D.P. has ever known, taking him from them would be devastating for him. Mrs. Pyle testified that A.D.P. calls her "mom" and her husband "dad," that her family has the economic resources and emotional commitment to provide for A.D.P., and that they wish to adopt A.D.P. and have him as a permanent member of the family.

14

A.D.P.'s CASA, Shonda Payne, also recommended that A.D.P. remain with the Pyles when the Department first took conservatorship because they provided a stable home for him. When she re-evaluated his situation in September of 2002, Payne again reported to the court that A.D.P. was in a good home environment with healthy interactions with his cousin, the Pyles' daughter, and that he had bonded with the Pyles and enjoyed socialization at day care. Payne recommended continuing that placement. In April 2003, Payne reported that the Pyles were the only family A.D.P. knew and that they provided an excellent environment and care for him. In August, she opined that the current placement was the stable and permanent home A.D.P. needs to grow into adolescence and that it was in his best interest to remain in that placement. Even Ward has testified that the placement is a stable and healthy option for A.D.P. and that Mrs. Pyle is a good mother figure for him.

*Any acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one.*

Rastetter testified that Ward lives a lifestyle of crime. The multiple charges against her and her current incarceration have separated her from her son and prevented her from playing any role in his life. Cress reported that, since A.D.P.'s birth, Ward violated conditions of her probation for unauthorized use of a motor vehicle by failing to satisfy community service requirements or pay fees and by leaving the county without permission and that Ward was convicted of 12 counts of burglary. Rastetter testified that Ward was initially sentenced to only nine months in SAFP plus three in a halfway house before she could have been released on probation. Rastetter testified that it was Ward's failure to satisfy the conditions of SAFP that caused her to be sentenced to four years' confinement instead. The Court could have found that Ward is currently unable to

15

make progress in developing a relationship with A.D.P. because of these behaviors, which separated her from her son. Rastetter testified that, according to Ward's probation officer, even when she was aware that her relationship with A.D.P. was at risk, Ward continued to use illegal substances and tested positive for marijuana on more than one occasion. Rastetter and others testified that Ward's absence from A.D.P.'s life was due to Ward's lifestyle and choices. Dr. Joe Jeffers, a psychologist who evaluated Ward, testified that she has displayed chronic poor judgment and has difficulty doing what is necessary for her child's development. He explained that some acknowledgment that there are problems is a prerequisite for emotional or behavioral change and that Ward did not seem able to acknowledge that she was struggling with problems.

*Any excuse for the acts or omissions of the parent.*

Ward asked the court to consider evidence of various influences on her parenting and learning difficulties. Ward admits she was immature at the time of her son's birth. She also testified that she has been diagnosed with bipolar disorder and that her treatment, including lithium and Prozac, has caused a marked improvement in her behavior and emotional control. Ward testified that her failure to complete her SAFP program was due to the program having taken her off her psychiatric medications and to the impact of her grandmother's death while Ward was in SAFP. Dr. Joe Jeffers' psychological evaluation of Ward, conducted at the Department's request, revealed that she has a mental age of 13 years, 4 months and an I.Q. of 76.[17] Ward also indicated during the psychological evaluation that her biological father had sexually abused her and that he and her

---

[17] This score falls in the borderline range of intellectual functioning, which means that Ward is able to learn new materials only with effort, support, and tutoring.

stepmother had both physically abused her as a child. Ward testified that her drug problem is in the past and that she wants to be A.D.P.'s mother.

Considering all of the evidence, a reasonable fact finder could have found that Ward is not able to care for A.D.P. or protect him from physical and emotional danger and that his needs will best be met by allowing the Department to assume permanent managing conservatorship of A.D.P. so that he may be adopted into a stable home. The evidence is factually sufficient to support the trial court's finding that it was in A.D.P.'s best interest to terminate Ward's parental rights. Because the court could have reasonably formed a firm belief or conviction that termination is in A.D.P.'s best interest, we uphold the court's finding against Ward's factual sufficiency challenge. *J.F.C.*, 96 S.W.3d at 266; *C.H.*, 89 S.W.3d at 18-19.

## CONCLUSION

The evidence in this case was factually sufficient to support the court's finding that termination of Ward's parental rights was in A.D.P.'s best interest. We affirm the order of the trial court terminating the parent-child relationship.

_____

David Puryear, Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed:   February 10, 2005

17