# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-10-00083-CV

Thomas Byrne, Appellant

v.

Texas Department of Family and Protective Services, Appellee

FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 395TH JUDICIAL DISTRICT
NO. 08-1882-F395, HONORABLE MICHAEL JERGINS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Thomas Byrne appeals from the trial court's final order terminating his parental rights to his two minor children, arguing that the evidence is legally insufficient to support the termination grounds and factually insufficient to support the trial court's finding that termination is in the children's best interest. We will affirm the termination order.

## FACTUAL AND PROCEDURAL BACKGROUND

Byrne is the father of six-year-old A.B. and four-year-old K.B. The Texas Department of Family and Protective Services (the "Department") first became involved with the family in 2003 and, since then, has received a number of referrals alleging physical abuse by Byrne and neglectful supervision by Byrne's wife, Monica.[1] As a result of the family's most recent

_____

[1] During the course of these proceedings, Byrne filed for divorce, but the record does not reflect that a divorce has yet been granted. We will refer to Monica by her first name to

involvement with the Department, a family services plan was put in place in November 2007. In accordance with that plan, Byrne was required to obtain housing, ensure that the children attended counseling, and prevent Monica from having any unsupervised contact with the children, due to concerns about her mental health and substance-abuse issues. After the case had been transferred to family-based services, the Department received a new referral alleging that Byrne began sexually abusing his five-year-old niece in 1986 and continued to do so for many years. Subsequent intakes and investigations by the Department in 2007 and 2008 indicated that Monica had repeatedly attempted suicide and that Byrne had allowed Monica to have unsupervised contact with the children in violation of the safety plan. Additional referrals were made in May and July 2008 relating to allegations of physical abuse to K.B.[2] and an incident when Byrne reportedly threatened Monica's father at gunpoint while the children were present.

On July 31, 2008, the Department filed a petition seeking to terminate Byrne's parental rights to K.B. and A.B. on the basis that he had knowingly placed or allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being, *see* Tex. Fam. Code Ann. § 161.001(1)(D) (West Supp. 2009), or engaged in conduct or knowingly placed the children with persons who engaged in conduct endangering their physical and emotional

---

avoid confusion.

[2] The referral was made after multiple bruises were discovered on K.B.'s lower back, rear end, and legs, for which no adequate explanation could be given; according to the Department's report, Byrne alternately suggested that the bruises resulted from his having used a new kind of soap or were marks left by "the potty seat."

well-being, *see id.* § 161.001(1)(E) (West Supp. 2009).[3] After a hearing, the Department was named temporary managing conservator and the children were placed in foster care.

At the March 27, 2009 permanency hearing, the Department took the position that although Byrne had engaged in his service plan and completed the required parenting classes, he had not made significant progress in addressing the issues that brought the children into foster care. Specifically, the Department reported that Byrne had not recognized that Monica presented a risk to the children. The Department further reported that, after continuing its investigation of the allegations of prior sexual abuse and interviewing the alleged victim in that case, it remained concerned that Byrne might pose a threat to his own children, particularly in light of reports that A.B. was "acting out" sexually in her foster placements in a way that suggested she could have been a victim of sexual abuse.[4] In light of these concerns, the Department changed its permanency goal for the family from "reunification" to "adoption."

The final hearing on the Department's petition to terminate Byrne's parental rights began December 1, 2009. The Department's final permanency report to the court indicated that Byrne had been engaged in therapy and sex-offender treatment, but that it would take "another year or two" before Byrne would complete that treatment and that there was no guarantee Byrne would

---

[3] The Department also sought to terminate Monica's parental rights, but before the final hearing commenced, she executed an affidavit of relinquishment. Monica is not a party to this appeal.

[4] In the Department's permanency report to the court, it included the results from Byrne's sex-offender evaluation, including the recommendation that Byrne not be allowed to have unsupervised contact with any children; should he choose to do so, it was recommended that Byrne participate in therapy with a licensed sex offender treatment provider or take a polygraph exam regarding whether he had had sexual contact with his niece.

be successfully discharged or fully rehabilitated. In addition, the Department reported that Byrne had submitted to and failed a polygraph examination asking whether he had sexually molested his niece.

After the two-day bench trial, at which Byrne, Monica, and several other witnesses testified, the trial court found by clear and convincing evidence that Byrne had (1) knowingly placed or allowed A.B. and K.B. to remain in conditions or surroundings that endangered their physical or emotional well-being, and (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well-being of the children, *see* Tex. Fam. Code Ann. § 161.001(1)(D), (E), and that termination of the parent-child relationship was in the children's best interest, *see id.* § 161.001(2). Byrne now appeals.

## DISCUSSION

In his first issue, Byrne argues that the evidence is legally insufficient to support the statutory grounds for termination. In his second issue, he argues that the evidence is factually insufficient to support the trial court's finding that termination is in the children's best interest. To terminate a parent-child relationship, a trial court must find by clear and convincing evidence that (1) the parent committed one or more of the acts specifically set forth in family code section 161.001 and (2) termination is in the best interest of the child. *See* Tex. Fam. Code Ann. § 161.001(1)-(2). Clear and convincing evidence is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008).

4

In this case, the trial court found that clear and convincing evidence supported the (D) and (E) grounds set forth in family code section 161.001. *See id.* § 161.001(1)(D), (E). Only one ground under section 161.001 is necessary to support a judgment in a parental-rights termination case. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Therefore, when termination is based on multiple grounds under section 161.001(1), as it was here, we must affirm the termination order if the evidence is sufficient to support any one of the grounds found by the district court. *Id.* at 362. Both subsections (D) and (E) require proof of endangerment, which means exposing a child to loss or injury, or jeopardizing a child's emotional or physical health. *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). The cause of the endangerment must be the direct result of the parent's conduct and must be the result of a conscious course of conduct rather than a single act or omission. *In the Interest of A.S.*, 261 S.W.3d 76, 83 (Tex. App.—Houston [14th Dist.] 2008, pet. denied); *In the Interest of J.W.*, 152 S.W.3d 200, 205 (Tex. App.—Dallas 2004, pet. denied). The statute does not require that conduct be directed at a child or cause physical harm; rather, it is sufficient if the conduct endangers the emotional well-being of the child. *See Boyd*, 727 S.W.2d at 533. Additionally, domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment. *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.). As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. *In the Interest of R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. ref'd).

Regarding the trial court's best-interest finding, there are several factors that courts are to consider when determining the best interests of the child. *See Holley v. Adams*,

544 S.W.2d 367, 370-72 (Tex. 1976). The factors include but are not limited to (1) the child's desires; (2) the child's emotional and physical needs now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not proper; and (9) any excuse for the acts or omissions of the parent. No one factor is controlling, and the facts of a case may mean that evidence of a single factor is sufficient to support a finding that termination is in the children's best interest. *In re J.O.C.*, 47 S.W.3d 108, 115 (Tex. App.—Waco 2001, no pet.). Permanence is of paramount importance in considering a child's present and future emotional and physical needs. *Dupree v. Texas Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 87 (Tex. App.—Dallas 1995, no writ). A parent's statutorily offensive conduct is often intertwined with the best-interest determination. *Horvatich v. Texas Dep't of Protective & Regulatory Servs.*, 78 S.W.3d 594, 601 (Tex. App.—Austin 2002, no pet.).

At trial, the court heard extensive testimony from Monica that her and Byrne's domestic life was unstable and often violent. She testified that she and Byrne were married in 2002, and their first child, A.B., was born in December 2003. Soon after A.B. was born, Monica and A.B. moved in with Monica's parents in Houston, where they lived until A.B. was about sixteen months old. Byrne slept on a friend's couch during that time "because he had nowhere else to go." At some point after A.B. was born, Byrne took a job in Dallas. For the next few years,

6

Monica and A.B. lived with Byrne intermittently, staying with him and his friends for a week or two at a time. In 2005, Monica and A.B. moved to the Dallas/Fort Worth area, where they stayed with Byrne on a more permanent basis. K.B. was born in 2006, and Monica again moved in with her parents to raise the baby. When K.B. was about five weeks old, she suffered an injury to her finger that could not reasonably be explained and that resulted in intervention by the Department; as a result, A.B. and K.B. lived in foster care for seven months.

Monica stated that Byrne was verbally and sexually abusive toward her during their marriage, and that in the year leading up to the termination proceedings, he had become physically abusive. She described one incident when Byrne shoved her onto the couch, leaving her bruised and scraped, and another when he took his gun out of the closet and threatened to shoot her family if they ever tried to come get her from the house; Monica stated that the children were present in the house when the incident with the gun occurred, that they saw the gun in Byrne's hand, and that she feared for their safety and her own.

Monica testified about her alcohol problem, which she acknowledged was "significant," and her bipolar disorder, which had caused her to be in and out of psychiatric facilities for most of her life. She stated that Byrne "condoned" her drinking and that he frequently took advantage of her when she was drunk; he would tell her that if she was going to drink, she had to remove her clothes, and he would then tie her up or tie her to the bed and have sex with her when she passed out. Monica did not know whether the children ever saw her tied up, but agreed that it was possible that they could have seen her handcuffed. Monica recounted other instances when she knew the children had witnessed Byrne removing her clothing to fondle her and to engage in other

7

sexual behaviors that she felt were inappropriate for them to see. On one occasion, Monica recounted, she regained consciousness after a bout of severe drinking to find pellets of rat poison scattered "all over" the bed where she and A.B. were sleeping.

Monica stated that there were times in the recent past when she posed a threat to the safety of her children as a result of her psychological and alcohol-dependency problems, yet Byrne continued to leave the children in her care. Because of her repeated hospitalizations and suicide attempts, Byrne would sometimes be left to raise the children alone. During these times, Monica worried for the children's safety and well-being because of the unsanitary living conditions. She was also concerned that Byrne did not discipline the children appropriately, explaining that he would hit K.B. on the head with a hairbrush hard enough to leave "whelps," pick up A.B. and shake her or pull her hair and squeeze her arms, or force-feed A.B. to make her finish all of her dinner.[5] Monica testified that, because she feared for the children's safety if they were returned to Byrne, she believed it was in the children's best interest for them to be adopted.

Byrne's sister, Patricia, and nieces, Amanda and Holly, all testified about the allegations that Byrne had a history of sexually abusing children. Patricia and Amanda both related an incident from the summer of 1986 or 1987 when Patricia came home to find Byrne, who was eighteen at the time, in the backyard with Amanda, then six years old, and five-year-old Holly; Byrne and both of the girls were naked. Patricia stated that she was incredibly concerned by Byrne's behavior at the time and was careful not to let Byrne be alone around any of the children from then

---

[5] Monica's mother, Marcia Moreno, also testified about Byrne's violent nature and inappropriate disciplinary behavior toward the children.

on, but explained that she never reported the incident to the authorities because her daughters assured her that Byrne had not molested them. However, according to Patricia, Holly came forward in 1995 and admitted that Byrne had molested her "on many occasions" and had threatened that she would be removed from her family if she ever revealed the abuse to anyone. Because Holly often found it difficult to be around Byrne, Patricia felt the need to exclude him from family events; she testified that Byrne seemed to understand that she had to do so "because of what had happened," although he never explicitly admitted wrongdoing.

In addition to the events Patricia recounted, Amanda described another incident when Byrne had taken her into the bathroom and made her touch his sexual organ. She testified that for the most part, however, Byrne had targeted her sister, Holly. Holly herself testified that her first memories of being abused by Byrne dated back to when she was five or six years old. She described a number of incidents when Byrne had inappropriately kissed and fondled her, forced her to touch his sexual organ, and digitally penetrated her sexual organ. Holly recalled the locations where several of the incidents had taken place, how Byrne had promised to give her candy if she "played with him," and that he had mentioned on several occasions that if the family ever found out about their secret, she would be removed from her family or her mom would never come home.

Kerrie Judice, the current Child Protective Services caseworker for A.B. and K.B., also testified. She described the procedural history of the case, explaining that it had initially been referred to family-based services and that the children were not removed from Byrne's care until several months after the initial referral and investigation, due to allegations that Monica was picking up the children from daycare by herself. Judice also outlined the family's extensive history with the

9

Department, noting the existence of a CPS case in a different county where the children had been removed and the Department had been named temporary managing conservator. She stated that the high number of referrals that the Department had received in this case caused her great concern for the children's welfare and stability—especially considering the children's young ages.

Judice further testified that the Department became increasingly concerned about the sexual-abuse allegations, based on A.B.'s "presenting some sexualized behaviors" in her foster home and committing sexual acts with K.B. and one of her first foster family's biological children, which resulted in A.B. having to be separated from K.B. and placed in a different foster home. As a result, Judice felt it was not appropriate for Byrne to have unsupervised contact with the children until he completed his sex-offender treatment, which would last a number of years. She also stated that she believed Byrne had endangered the children's safety by allowing Monica to be around the children even though he was aware of her psychiatric problems and the Department's safety plan preventing her from having contact with the children.[6] Judice testified that, in her opinion, adoption would be in the children's best interest, because the "biggest thing" the children need is stability and "the Department has been involved since, practically, day one with [A.B.]."

The children's therapist, Dr. Sharon Bischofshausen, testified that both K.B. and A.B. are doing well in their current placement and had not indicated to her that they missed their birth parents or were interested in living with them. Bischofhausen testified that A.B. often speaks fondly

---

[6] Christi McCaffery, the caseworker assigned to this case when it was initially referred to family-based services, shared Judice's concerns. McCaffery testified that each time Monica was hospitalized and released from treatment, Byrne asked if she could return home to the family, even though he knew that this violated the safety plan, resulting in multiple "placement breakdowns" over the course of the case.

of her foster parents, calls them "mommy" and "daddy," and indicated that she feels safe in her foster home. She also spoke of how safety issues that she believed were unrelated to A.B.'s foster placement had manifested themselves during A.B.'s play; during at least ten therapy sessions, A.B. had made comments like, "There isn't a daddy in this home," and "I just want to be with a mommy." A.B. also did things that suggested "abandonment or somebody not being there" and other types of discord, such as one toy biting another and then having to be handcuffed and taken off to jail. According to Bischofshausen, A.B.'s comments and behaviors signaled a disturbance in her past home life and family relationships. She testified that the children's mental health would both benefit from a more stable home life that provided them predictability and structure.

Byrne's counselor, Karen Kauffman, testified that Byrne had admitted to her that he allowed Monica to care for the children without supervision. Kauffman testified that she was concerned Byrne was "not as protective as he needed to be" when it came to understanding the risks that Monica with her mental heath issues posed to the children. She also doubted whether Byrne would actually be able to shut Monica out of his life, as he "vacillated back and forth from not wanting to be with her to wanting to have her back." Byrne's sex-offender therapist, Shelley Graham, also testified. She stated that Byrne had begun his treatment and was responding well, but there was still no way to determine how much longer he would need to be in treatment and that, typically, treatment takes up to three or four years. She also testified that, as Byrne had not yet been "adjudicated or mandated" for the prior sexual-abuse allegations, he had not yet begun to be open about the offenses or the offensive behaviors.

11

The trial court also heard from Harold Krause, who had known Byrne and Monica for eight years through their church.  He testified that he had never seen anything that alarmed him about Byrne's parenting skills or made him believe that Monica or the children were fearful of Byrne.  Krause testified that he believed Byrne to be a proactive, motivated Christian parent who wanted very much to be with his children.  The same sentiments were expressed by Byrne's pastor, John Davenport, who testified that Byrne had talked and prayed with him for many hours about the challenges in his marriage and his affection for the children.  Both Krause and Davenport testified that they felt Byrne was hesitant to end his marriage because of his faith and his commitment to making the marriage work.

Shawna Padilla, the owner and director of the children's daycare, stated that she never noticed anything about the children's demeanor or appearance that caused her concern; on the contrary, they were always clean and looked well cared-for.  She testified that she and her husband were willing to take the children while Byrne completed his sex-offender treatment and that it was not in the children's best interest for Byrne's parental rights to be terminated because she believed children should not be raised without either of their parents.

Byrne's longtime friend, Lawrence Madl, testified that from the time he first met Monica, he noticed that she was "not all there, mentally" and witnessed "tantrums" when Monica would drink and then have to be subdued because she would get violent.  He stated that Byrne and the children had a very good relationship, that the children adored their father, and that he knew of no reason why Byrne's parental rights should be terminated.  Madl did, however, testify that he

would never have left his own children in Monica's care and that it concerned him that Byrne had continuously done so.

Byrne also testified. He admitted that, after the children were removed by the Department, he had allowed Monica to spend unsupervised time with the children for brief periods of time, but stated that he had believed this was allowed because he reasoned that it was "the next logical step" as he and Monica progressed through their services. As to his marriage, he agreed that there had been episodes of violence in the past, but testified that Monica was the aggressor and would be verbally abusive and vulgar toward him during the "episodes" when her medication was not correct. He stated that the only times Monica was "really stable" were when she was pregnant. Byrne also testified that he never acted in a sexually inappropriate way with his wife and that the children never saw Monica when she was intoxicated because she would drink in her bedroom with the door closed. Regarding the allegations that he had abused his nieces in the past, he stated that, since the Department had begun investigating, he had "vague recollections" of an incident in the bathroom with Amanda and of "the incident with the back yard, but that's about it." He denied having ever used one of his guns to threaten his wife or anyone else, but acknowledged that he had removed the gun from storage one time when he was having an argument with Monica and was upset. Byrne stated that because the children had such good rapport with Padilla from their time in her daycare, he believed it was in their best interest to live with her so that he could continue to visit them while he finished his treatment.

On cross-examination, Byrne stated that although he never saw Monica drink in front of the children, he was aware that Monica snuck out of the house to buy alcohol and took A.B., who

13

was not secured in a car seat, with her during these trips, leaving K.B. at home, unsupervised. He further testified that he did not understand why the Department would be concerned that he left the children with someone who had an alcohol problem because "Monica mostly drank on holidays or those things. She didn't have a blatant 'I've got to drink every day' problem," to his knowledge.

Having reviewed all of the evidence in the light most favorable to the trial court's finding, we conclude that the trial court could reasonably have formed a firm belief or conviction that the statutory grounds for termination were met. *See In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). In particular, there was sufficient evidence that Byrne had knowingly placed the children in Monica's care when undisputed evidence demonstrated that she posed a danger to the children's physical or emotional well-being on account of her significant psychological and substance-abuse problems. *See* Tex. Fam. Code Ann. § 161.001(D), (E). We overrule Byrne's first issue.

Likewise, we conclude that the trial court could reasonably have formed a firm belief or conviction that termination of Byrne's parental rights was in the children's best interests. *See In re J.F.C.*, 96 S.W.3d at 266. Although the trial court heard some testimony that the children were bonded to Byrne, that he had eagerly engaged in his service plan, and that his ongoing treatment was going well, it also heard significant testimony regarding the continuous pattern of disruption in the children's lives as a result of Byrne's long history with the Department and, by contrast, the stability that the foster homes provided to the children. Moreover, the trial court could also have considered the allegations of prior sexual abuse and the reality that Byrne, by choosing to undergo the Department-recommended sex-offender therapy, would not complete therapy for at least a few more

14

years—with no guarantee that the therapy would be effective—and therefore would have to rely on substitute care for the duration of his treatment program.  We overrule Byrne's second issue.

## CONCLUSION

Having overruled Byrne's issues on appeal, we affirm the final order of termination.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Puryear and Pemberton

Affirmed

Filed:   September 29, 2010