47 S.W.3d 108 (2001)
In the Interest of J.O.C., A Child.
No. 10-00-185-CV.
Court of Appeals of Texas, Waco.
April 25, 2001.
*110 Jose R. Villanueva, Law Office of Jose R. Villanueva, Coolidge, for appellant.
Robert S. Johnson, Asst. Sol. Gen., Cathren Page Koehlert, Office of General Counsel, Austin, Jeff Stuver, Mexia, Attorney Ad Litem, for appellee.
Before Chief Justice DAVIS, Justice VANCE, and Justice GRAY.

OPINION
GRAY, Justice.
Following a jury trial, the trial court terminated the parental rights of Stephanie Lanier and James Cox to their son, J.O.C. Only Stephanie appeals this decision, claiming that:
1. The court abused its discretion in admitting the evidence regarding events after the release of the child to foster care.
2. The court abused its discretion in denying Stephanie's motion for directed verdict.
3. The evidence is legally insufficient to support an involuntary termination of her parental rights.
4. The court abused its discretion in denying Stephanie's motion for judgment notwithstanding the verdict and her motion for new trial.
We affirm the decision of the trial court.

FACTUAL BACKGROUND
Seventeen year-old Stephanie gave birth to J.O.C. in Mexia, Texas. The father of the child, James Cox, was Stephanie's thirty year-old boyfriend. He initially denied paternity, but DNA tests later proved otherwise. The baby was born two months premature with respiratory complications and a yeast infection that had spread to his blood stream. Because of his critical condition, J.O.C. was immediately transferred to Hillcrest Hospital in Waco, Texas.
Hospital personnel contacted Child Protective Services a month and a half later to report that Stephanie had only visited her baby twice since his birth, in spite of the hospital's offer to provide room, board, and transportation to Waco. Child Protective Services located Stephanie about two *111 weeks later, and the caseworker explained the importance of Stephanie visiting her child and the possible consequences of her failure to learn to care for his special needs. The consequences discussed specifically included removal of her child. Stephanie visited the child the next day, but did not visit again while the child was in the hospital.
When the hospital was ready to release the child, the staff did not feel it would be safe to release him into Stephanie's care because she had not learned to cope with his feeding difficulties, breathing problems, and other medical conditions. Child Protective Services filed suit, took custody of the child, and placed him in foster care. Weekly visits were scheduled for both parents. Stephanie showed up for about half of her visits; Cox did not visit at all. After more than a year, the caseworker for Child Protective Services felt that Stephanie was not bonding with the child and that she had made no progress with her parenting skills.
A jury trial was conducted to determine if termination was justified. At the trial, the State alleged two possible grounds for the termination of parental rights: (1) knowingly placing or allowing the child to remain in conditions or surroundings which endangered the physical or emotional well-being of the child, or (2) engaging in conduct or knowingly placing the child with persons who engage in conduct which endangered the physical or emotional well-being of the child. See TEX. FAM.CODE. ANN. § 161.001(D), (E) (Vernon Supp. 1998). The State also alleged that it would be in J.O.C.'s best interest to terminate his parents' rights. See TEX. FAM.CODE ANN. § 161.001(2) (Vernon Supp.1998).
The court overruled Stephanie's objection to admission of evidence regarding events after the release of the child to a foster home and allowed the jury to consider evidence of Stephanie's attitude and medical care skills, her psychological and emotional history, and her mother's history with Child Protective Services. The court also denied Stephanie's motion for directed verdict. In response to the single question in the charge asking if the parent-child relationship between Stephanie and J.O.C. should be terminated, the jurors answered in the affirmative. The trial court denied Stephanie's motion for judgment notwithstanding the verdict and entered a judgment terminating Stephanie's parental rights. Stephanie did not attend the last day of the trial and offered several reasons for her absence-her mother was in the hospital, she had to babysit two siblings (who were in school at the time), and she could not find transportation. The court denied her motion for new trial.

TERMINATION OF PARENTAL RIGHTS
We recognize the gravity of the termination of parental rights and appreciate the possible effects of its finality. As we stated in J.M.T.:
The natural right existing between a parent and child is of constitutional dimension. The right to raise one's child has been characterized by the United States Supreme Court as essential, as a basic civil right, and as a right far more precious than property rights. A termination decree is complete, final, irrevocable, and divests for all time that natural right as well as all legal rights, privileges, duties, and powers with respect to each other except for the child's right to inherit. Termination is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by "clear and convincing evidence ." (cites omitted).
*112 In re J.M.T., 39 S.W.3d 234, 237 (Tex. App.-Waco 1999, no pet.).
Because of the drastic nature of involuntary termination under the provisions of Section 161.001 of the Family Code, we require the petitioner to establish two elements, each by clear and convincing evidence. First, petitioner must prove a culpable act or omission on the part of the parent under the first subsection of the statute. Second, petitioner must prove that termination of the parent-child relationship is in the best interest of the child. TEX. FAM.CODE ANN. § 161.001(1), (2) (Vernon Supp.1998). Proof of one element does not relieve the petitioner of the burden of proving the other. Holley v. Adams, 544 S.W.2d 367, 370 (Tex.1976). Clear and convincing evidence is defined as "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Spangler v. Texas Dept. of Protective and Regulatory Services, 962 S.W.2d 253, 256 (Tex.App.-Waco 1998, no pet.).

STANDARD OF REVIEW: ADMISSION OF EVIDENCE
The admission or exclusion of evidence is within the trial court's discretion. City of Brownsville v. Alvarado, 897 S.W.2d 750 (Tex.1995). A trial court abuses its discretion when it reaches a decision in an arbitrary or unreasonable manner or without reference to any guiding rules or principles. See Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241-42 (Tex.1985). We may not reverse a trial court's decision simply because we disagree with it. See id. at 242.

APPLICATION OF LAW: ADMISSION OF EVIDENCE
In her first issue, Stephanie contends that the court abused its discretion by admitting evidence of events after the release of J.O.C. to foster care. Over Stephanie's relevance objection, the trial court found that failing to visit, failing to interact and inability to provide medical care were all continuations of the behavior occurring before the child's release.
Basically, Stephanie now claims that the State failed to plead constructive abandonment and non-compliance with court orders (TEX. FAM.CODE ANN. § 161.001(1)(N), (O)), and that the evidence admitted does not support either of the grounds that the State actually pled (TEX. FAM.CODE ANN. § 161.001(1)(D),(E)). While the evidence that the State presented would be relevant to support the grounds of constructive abandonment and non-compliance, that does not prevent that same evidence from supporting allegations under subsections D or E. To establish an act under subsection E, the petitioner must show that the parent's conduct or someone else's conduct endangered the child. According to the Supreme Court, "endanger" as used in subsection E means that the child has been exposed to loss or injury or is jeopardized as a result of the parent's conduct. The endangerment must involve "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment;" however, it is not necessary that the child actually suffer injury or that the parent directs the conduct at the child. Dep't of Human Services v. Boyd, 727 S.W.2d 531, 533 (Tex.1987). Because failure to visit, interact and learn medical techniques could endanger the child under the Boyd definition, we find that the trial court did not abuse its discretion in allowing the jury to consider evidence supporting those failures following the child's release from the hospital. Stephanie's issue 1 is therefore overruled.

*113 STANDARD OF REVIEW: LEGAL SUFFICIENCY
We use the traditional "no-evidence" standard of review in considering a legal sufficiency complaint of a finding that must be established by clear and convincing evidence. We consider only the evidence that tends to support the findings and disregard all evidence and inferences to the contrary to determine if there is more than a scintilla of probative evidence in the record to support the decision. In the Interest of D.L.N., 958 S.W.2d 934, 936 (Tex.App.-Waco 1997, pet. denied, pet. rehear'g denied); Lucas v. Texas Dep't of Protective and Regulatory Services, 949 S.W.2d 500, 502 (Tex.App.-Waco 1997, writ denied). If there is any evidence in the record to support the finding of the trial court, we will overrule the appellant's legal sufficiency complaint. In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661-62 (1951).

APPLICATION OF LAW: LEGAL SUFFICIENCY
Acts or Omissions
In order to terminate Stephanie's parental rights, the State was required to prove at least one of the acts or omissions enumerated in the Family Code. TEX. FAM. CODE ANN. § 161.001(1) (Vernon Supp. 1998). One of these acts is engaging in conduct which endangered the physical or emotional well-being of the child. Id. at § 161.001(1)(E).
We have found that a "course of conduct" by a parent that jeopardizes a child's physical or emotional well-being is evidence of endangerment as defined by Boyd. In the Interest of D.L.N., 958 S.W.2d 934, 938 (Tex.App.-Waco 1997, pet. denied). In the D.L.N. case, we could not point to one specific act that justified termination of parental rights. We did, however, find that the pattern established by the parent's bad temper, neglect of the child's physical and emotional well-being, inability to deal with the child's emotional needs, limited interaction with the child and treatment of the child's siblings was legally sufficient to support an involuntary termination under section 161.001(1)(E). Id. at 938-39.
In this case, the jury could conclude that Stephanie engaged in a similar course of conduct. First, testimony showed that Stephanie's conduct endangered the physical well-being of the child. Stephanie's child was medically fragile, with feeding difficulties, a propensity to stop breathing, and susceptibility to infection. However, she did not prepare for the hospital's release of her child by learning basic feeding techniques. A caseworker testified that Stephanie acted as if she "didn't really care" to learn about the sleep apnea monitor (an alarm that warned when the child had stopped breathing). She did not attend the CPR class that is required for all parents of premature babies. She did not learn preventive care to counter the respiratory infections that her child is susceptible to. The child's doctor wrote in his chart: "It is clear to me at this time that mom cannot care for this infant. Unless something changes drastically, I cannot medically discharge this infant to mom's care. Mom must show some initiative that she will be able to cope with the obstacles involved in caring for this preemie infant."
Testimony indicated that Stephanie had several opportunities to show some initiative. The hospital offered to provide room and board and to pay for her transportation to Waco. She did, in fact, accept the offer of help on three occasions, but chose to watch television in her room most of the time rather than work with her child. Stephanie signed a safety plan with the Child Protective Services caseworker agreeing to *114 visit the child for at least one feeding on a daily basis while the child remained in the hospital. She did not follow through with the plan. Dr. Shinder, a licensed clinical psychologist, testified that he asked Stephanie to complete several small tasks for the benefit of the child, such as to check out a library book on child care and to call the government program Chronically Ill and Disabled Children for referrals. Stephanie failed to comply with any of his requests. Although Stephanie did not actually injure the child physically, her conduct put him at great risk of physical harm had he been released to her. Dr. Shinder commented that had the child been sent home from the hospital with Stephanie, he would not have survived.
Second, Stephanie exhibited a course of behavior showing her inability to deal with J.O.C.'s emotional and developmental needs. The unrebutted testimony is that bonding between parent and child is essential to the emotional health and development of the child. Stephanie visited her child three times while he was in the hospital and showed up for only about half of the scheduled visits after he was moved to a foster home. Three witnesses, all employees of Child Protective Services who had observed Stephanie's visits with the child, testified that Stephanie had little interaction with her child. According to the visitation supervisor, Stephanie spoke to her child four times over a period of one and a half years: "Come here;" "Don't throw that;" "Quit hitting yourself in the head;" and "Do you want that?" Other testimony revealed that Stephanie kept J.O.C.'s body away from her own. She avoided face-to-face contact with him. J.O.C. exhibited no reaction to Stephanie when she entered the room for her visitation, and Stephanie did nothing to elicit any response from her child. According to Dr. Shinder, Stephanie could not answer his questions about her child and has not bonded with J.O.C.
In considering the evidence in a light that supports the finding made by the trier of fact, we conclude that there was more than a scintilla of evidence that Stephanie engaged in conduct that endangered the physical or emotional well-being of J.O.C. We find that the State has proved a culpable act on the part of Stephanie under subsection E and that we need not address the grounds alleged under subsection D. However, before we can overrule Stephanie's legal sufficiency challenge, we must also examine the legal sufficiency of the evidence showing that termination is in the best interest of J.O.C.
Best interest of the child
There is a strong presumption that the best interest of children will be served by preserving the parent-child relationship. Wiley v. Spratlan, 543 S.W.2d 349, 352 (Tex.1976). Thus, the party seeking to deprive the natural parent of parental rights must establish this second element by clear and convincing evidence. Herrera v. Herrera, 409 S.W.2d 395, 396 (Tex.1966). Again, however, in reviewing a legally insufficient complaint, we apply a no-evidence standard. In the Interest of D.L.N., 958 S.W.2d 934, 936 (Tex.App.-Waco 1997, pet. denied).
The Texas Supreme Court has recognized several factors that may be considered in determining when termination is in the best interest of the child. Holley v. Adams, 544 S.W.2d 367, 372 (Tex.1976). These include:
1. The desires of the child;
2. The emotional and physical need of the child now and in the future;
3. The emotional and physical danger of the child now and in the future;
4. The parental abilities of the individuals seeking custody;

*115 5. The programs available to assist these individuals to promote the child's best interest;
6. The plans for the child by the party seeking custody;
7. The stability of the home or proposed placement;
8. The act/omission of the parent which may indicate that the existing parent-child relationship is not proper; and
9. Any excuse for the acts/omissions of the parent.
Id.
This listing is not exhaustive, but it does include the most important considerations. No single consideration is controlling. However, the analysis of one factor may be adequate in a particular factual situation to support a finding that termination is in the best interest of the child. As we apply the Holley test, we note that it focuses on the best interest of the child, not the best interest of the parent:
1. Desires of the child
J.O.C. is too young to verbally express his preferences. However, testimony indicates that the child was indifferent to visits from his mother.
2. Current and future needs of the child
According to testimony, J.O.C. is developmentally delayed because of his premature birth. This puts him at risk both physically and emotionally. J.O.C. has had feeding difficulties, breathing problems, and infection susceptibilities. He has been diagnosed with a slight case of cerebral palsy. According to Dr. Shinder, J.O.C. needs a caregiver who is extremely health conscious because of the tendency for premature infants to develop other health problems requiring special assistance in the future.
Testimony also revealed that as a developmentally delayed child, J.O.C. needs to bond with his caregiver. Communication, interaction, encouragement, touching are all necessary for J.O.C. to progress normally with such basics as walking, talking, and social attachments. The evidence summarized above amply demonstrated that Stephanie did not prepare herself to deal with the current or future needs of J.O.C.
3. Current and future dangers to the child
There is evidence of physical and emotional danger to J.O.C. if he is placed with Stephanie. According to Dr. Shinder, he once asked Stephanie what she would do if the child stopped breathing. She answered that she would find her stepmother. Based upon such responses from Stephanie, Dr. Shinder concluded that Stephanie was not, and is not, capable of caring for the physical needs of her child.
A caseworker testified that a child can be significantly damaged if he does not experience physical and communicative interaction. If bonding is not adequate, the child can develop attachment disorders. Dr. Shinder added that children who have not bonded with adults do not value relationships and are more inclined to have the kinds of interactions with other people that are harmful. Dr. Shinder further testified that there is no mother-child connection between Stephanie and J.O.C. at all.
4. Parental abilities
Dr. Shinder's comments reveal Stephanie's lack of parenting skills: "She views the baby as a possession that's hers and that she wants back, but she doesn't have a sense of how to take care of that child." Child Protective Services workers monitored Stephanie and her interactions with *116 J.O.C. for more than a year and reached the conclusion that she did not have adequate parenting skills and had made no progress in her parenting skills.
5. Available programs
Dr. Shinder testified that he had provided Stephanie with 12-15 phone numbers for available programs. Stephanie never reported having contacted any of these.
6. Plans
A supervisor for Child Protective Services testified that if parental rights were terminated, J.O.C. would be placed in an adoptive home. Although Stephanie's mother had expressed an interest in obtaining custody of the child, she was not considered an appropriate placement because of her own history with Child Protective Services. Testimony also indicated that J.O.C. was extremely adoptable, even with his special needs.
Since Stephanie did not testify, it is not clear what her plans for J.O.C. are. According to Dr. Shinder, Stephanie showed poor judgment as she planned for living arrangements for herself and J.O.C. For example, at one time, she moved in with a woman whose parental rights to four children had been terminated.
7. Stability of the home
A Child Protective Services caseworker testified that Stephanie could not provide a stable environment for J.O.C. In one and a half years, Stephanie had lived in at least five different locations with a variety of roommatesincluding the child's father, a man who physically abuses her.
8. Indications that the parent-child relationship is not proper
Testimony indicated that Stephanie has not bonded with J.O.C. Dr. Shinder testified that there is no relationship between Stephanie and her child.
9. Excuses
Because Stephanie never testified, we have no direct evidence of how Stephanie may have justified her acts and omissions. According to Dr. Shinder, Stephanie never bonded with her child because of her lack of motivation, commitment and interest.
We hold that there is some evidence that supports the trial court's determination that termination of the parent-child relationship was in the best interest of J.O.C. in addition to evidence of a culpable act on the part of Stephanie. Consequently, we find that the record contains legally sufficient evidence to support an involuntary termination under Section 161.001(1)(E) of the Family Code. Stephanie's issue 3 is therefore overruled.
MOTION FOR DIRECTED VERDICT AND MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT
Stephanie complains that the court abused its discretion when it denied her motion for directed verdict (issue 2) and her motion for judgment notwithstanding the verdict (part of issue 4). Both motions were based on the claim that the State did not present any evidence to support the grounds that the parent engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered the physical or emotional well-being of the child (TEX. FAM.CODE ANN. § 161.001(1)(E)). Since we have found that the record contains legally sufficient evidence to support an involuntary termination under this section of the Family Code, we find that the trial court did not err in denying either the motion for directed verdict or the motion for judgment notwithstanding the verdict. Therefore, *117 Stephanie's issue 2 and that part of issue 4 is therefore overruled.

MOTION FOR NEW TRIAL
The second part of Stephanie's issue 4 contends that the court abused its discretion when it denied her motion for new trial. A denial of a motion for new trial is reviewed under an abuse of discretion standard. Champion Int'l Corp. v. Twelfth Court of Appeals, 762 S.W.2d 898, 899 (Tex.1988)(orig.proceeding).
In her motion, Stephanie argued that the court should grant a new trial because she did not attend the last day of the trial. To obtain a new trial after failing to appear, the defendant must: (1) prove the failure to appear was not intentional or the result of conscious indifference but was the result of a mistake or accident; (2) set up a meritorious defense; and (3) show that a new trial will not cause delay or injury. Director v. Evans, 889 S.W.2d 266, 268 (Tex.1994). At the hearing on the motion for new trial, Stephanie offered no proof of mistake or accident. She testified first that her mother was in the hospital that day, but then admitted that she was not at the hospital with her mother. She told her Child Protective Services caseworker that she had to babysit her siblings. However, the children left for school at 7:00 a.m. and did not return until 4:30 p.m. Stephanie argued that she did not have transportation, yet did not mention that fact to her Child Protective Services worker during any of her three telephone conversations with the agency that day.
"Conscious indifference" has been defined as the failure to take some action that would seem indicated to a person of reasonable sensibilities under the circumstances. Johnson v. Edmonds, 712 S.W.2d 651, 652-53 (Tex.App.-Fort Worth 1986, no writ). It therefore appears that Stephanie's absence from trial was the result of conscious indifference. We find that the court did not abuse its discretion in denying Stephanie's motion for new trial, and thus overrule the balance of issue 4.

CONCLUSION
Having overruled Stephanie's four issues, we affirm the trial court's judgment of termination.