# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00103-CV

**Tabitha LaRocca, Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

**FROM THE DISTRICT COURT OF BELL COUNTY, 146TH JUDICIAL DISTRICT
NO. 231,242, HONORABLE RICK MORRIS, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

Tabitha LaRocca appeals from the trial court's order terminating her parental rights to her son, R.W., after a jury found that her rights should be terminated.[1]  On appeal, LaRocca challenges the legal and factual sufficiency of the evidence to support the jury's finding.  Because we conclude that the evidence is legally and factually sufficient to establish (1) statutory grounds for termination and (2) that termination is in the child's best interest, we affirm the trial court's order of termination.

## BACKGROUND

The Department of Family and Protective Services (the "Department") brought suit against Tabitha LaRocca and Gregory Worley for termination of parental rights to their son, R.W. R.W.'s foster parents, Virgil and Melody Cowger, intervened.

---

[1]  At some point after this suit was filed, LaRocca obtained a divorce and changed her name to Tabitha Guerra.  Because the trial court's order of termination refers to her as Tabitha LaRocca, we will do the same for the purposes of this opinion.

The Department first became involved in July 2008, when R.W., who was five weeks old at the time, was brought to the emergency room by LaRocca and R.W.'s paternal grandparents, Raymond and Rebecca Worley.[2] R.W. suffered from a fractured skull, a hematoma on the right side of his head, a "big subdural hematoma" on the left side of his head, and brain shearing.[3] R.W.'s injuries required several emergency surgeries and two-and-one-half weeks of hospitalization. Emergency room doctors diagnosed the injuries as resulting from non-accidental trauma.

Shortly after the Department became involved, the Department's investigator, Kecia Amos-Folks, prepared an affidavit summarizing her investigation. LaRocca told Folks that the injury occurred when she, Raymond, and Rebecca left R.W. with Worley to attend a doctor's appointment. LaRocca said that prior to leaving the house, she was holding R.W., who was awake and uninjured. Approximately four hours later, Rebecca received a phone call from Worley informing her that the baby had fallen off of the bed. LaRocca, Raymond, and Rebecca returned home and drove R.W. to the fire station, where an ambulance took them to the hospital. Worley told Folks that R.W. accidentally fell from his lap and hit his head on the side of the bed frame. R.W.'s neurosurgeon, Dr. Patricia Aronin, testified at trial, however, that R.W.'s injuries could not have occurred from falling off of a bed. She stated that the severity of R.W.'s brain shearing and skull damage required a violent force, such as "violent shaking and then . . . being thrown down on something that was pretty hard . . . or be[ing] hit with something." Such an injury could occur from a fall only "if you fell out of the fourth story window onto the pavement. . . . It would take that sort

---

[2] For the sake of clarity, we will refer to R.W.'s grandparents and foster parents by their first names.

[3] Documents related to the Department's investigation indicate that brain shearing occurs when a body traveling at a certain velocity stops suddenly and the brain continues traveling forward in the brain cavity, ripping blood vessels. It is most often seen in high speed car accidents.

of a distance and an impact." Despite the severity of R.W.'s injuries, LaRocca testified at trial that for nearly six months she continued to believe Worley's claims that R.W. was accidentally injured by falling from the bed.

The Department sought and obtained an order appointing it temporary managing conservator in August 2008, while R.W. was still hospitalized, on the grounds that the Department could discern no credible explanation for the cause of R.W.'s injuries and that LaRocca persisted in her belief that the injury was an accident.[4] Worley was later convicted of serious bodily injury to a child with a deadly weapon in connection with R.W.'s injuries and was sentenced to twenty years in prison.[5] The Department sought termination of both Worley's and LaRocca's parental rights and a jury trial was held in January 2010.

### R.W.'s Condition

At trial, Dr. Aronin testified to R.W.'s current condition. She stated that R.W. has sustained several long-term effects from his injuries and is considered a medically fragile child. In addition to his initial surgeries, R.W. has had two other major surgeries in December 2008 and July 2009. He is at risk for seizures and takes seizure medication twice a day. He also wears an orthotic helmet 23 hours a day to protect the holes in his skull and shape his head as it grows. Because of his helmet, R.W. can overheat easily, which may cause seizures. R.W.'s caretaker must be diligent to prevent R.W. from becoming too hot, and remove his clothing and helmet if he starts looking overheated. Additionally, R.W. has two fluid-draining shunt tubes in his head which must

---

[4] The Department later ruled out the possibility that R.W.'s injuries were caused by LaRocca.

[5] The court in Worley's criminal proceeding found the bed to be a deadly weapon.

3

be constantly monitored, as a shunt malfunction may cause brain damage or death. Because R.W. is too young to communicate discomfort, in order to discover a shunt malfunction, R.W.'s caretaker must know R.W., understand his patterns and behaviors, and recognize small behavioral changes.

Melody, R.W.'s foster mother, testified that as a result of R.W.'s medical conditions, he sees a number of doctors on a regular basis. He attends physical, occupational, and speech therapy four times per week for 30 minutes to an hour each, helmet fittings every two weeks for 30 minutes to two hours, and has appointments with his neurosurgeon every two to three months, his neurologist every two to four months, his pediatric gastroenterologist every six months or as needed, and his opthamologist every two months, as well as regular pediatric and dental appointments. R.W.'s doctors are currently in Killeen, Austin, Round Rock, and Temple.

According to Dr. Aronin, R.W. was nineteen months old at the time of trial but was functioning at the level of a twelve-month-old, and will continue to have severely limited development. She testified that, based on what she had seen so far, R.W. will forever have the cognitive ability and motor skills of a young child and will need care into adulthood. Though his body will grow into an adult, she stated that he will likely be unable to walk, his speech will be limited, and he will never be "normal." She was unsure whether he will ever learn to dress, bathe, or feed himself.

Upon R.W.'s release from the hospital, he was placed in foster care with the Cowgers in Belton, where he still remains. Melody Cowger is a licensed vocational nurse employed with a pediatric home health agency and has experience caring for medically fragile children. R.W.'s neurosurgeon, pediatrician, physical therapist, caseworker, and guardian ad litem all testified to the

4

high quality of care the Cowgers have provided R.W. The Cowgers testified that they wish to adopt R.W. following a successful termination.

***The Guerras' Home in Brownsville***

Shortly after the Department took custody of R.W., LaRocca chose to move into her parents' home in Brownsville, seven hours away. LaRocca testified that she and Worley had planned on moving to Brownsville even before R.W. was born. Because she had no family, friends, job, or car in Belton, LaRocca felt that "the only thing [she] could do was go home." Though she looked into housing at the Ronald McDonald house, LaRocca admitted she never looked into other housing or employment options in Belton because she was told by the Department that she needed family support, which was located solely in Brownsville. Christina Garcia, R.W.'s case worker, testified that it was her understanding that Raymond and Rebecca offered LaRocca housing and transportation at their home in Belton, which LaRocca did not accept. LaRocca disagreed, stating that Raymond and Rebecca never made such an offer. LaRocca instead testified that they moved her and Worley's belongings out of their home because the Department told them that LaRocca and Worley could not live with them if Raymond and Rebecca wished to be considered as a placement for R.W.[6]

Shortly thereafter, the court ordered a home study on the home of LaRocca's parents, Gina and Javier Guerra, to evaluate their home as a possible placement option. According to Garcia, the study was performed in December 2008, and the home was approved on the conditions that

---

[6] Garcia testified that a home study was never completed on Raymond and Rebecca because they kept a pet pit bull in their home.

(1) R.W. be medically cleared to make the trip[7] and (2) that the Guerras be able to prove to the Department that they could provide for all of R.W.'s medical needs, including producing a list of doctors in the Brownsville area that had agreed to take R.W. as a patient. Garcia testified that Gina did not give her a list of proposed Brownsville doctors until nearly a year after the home study. Garcia further testified to her concern that because Gina and LaRocca attended so few doctor's appointments and visitations, the Guerras were not equipped to provide R.W. with a safe home environment.

*Family Service Plan*

In September 2008, the court adopted a family service plan, developed by the Department, LaRocca, and her family. With the goal of reunifying LaRocca and R.W., the plan set out a number of tasks for her to accomplish before reunification could occur. The plan required her to: (1) complete parenting classes; (2) continue taking classes toward her associate's degree; (3) participate in individual therapy; (4) take any and all necessary educational classes and obtain advice from medical staff to educate, prepare, and implement the care needed to ensure R.W.'s development and growth; (5) be sensitive to the special needs and care necessary for R.W.'s well-being; (6) stay involved with the current care and progress of R.W. through constant contact and communication with caregivers and medical staff; (7) participate in a psychological evaluation; (8) demonstrate the ability to meet R.W.'s basic needs and ensure safety of the child; (9) maintain a stable job; and (10) maintain a stable and safe home suitable for R.W. LaRocca testified that she has followed the family service plan's instructions and has done everything the Department has

---

[7] According to Garcia, R.W. was not medically cleared to travel to Brownsville until the week before trial.

6

asked her to do, including obtain a psychological evaluation and attend regular therapy sessions. At trial, the Department took the position that LaRocca had failed to make satisfactory progress, particularly with regard to providing for R.W.'s safety and medical needs.

At an August 28, 2008 hearing, the court allowed LaRocca and her mother, Gina, one hour per week of supervised visitation time and eventually allowed Melody to supervise visits. In May 2009, LaRocca was allowed an unlimited number of visits and in June 2009 was granted unsupervised visits.

R.W. was in the Department's custody for seventeen months before trial, during which LaRocca visited him sixteen times, totaling approximately 30 hours. In that time, she also attended one appointment with Dr. Asbury, R.W.'s pediatrician, one appointment with Dr. Aronin, R.W.'s neurosurgeon, one helmet-fitting appointment, and one therapy appointment. Gina accompanied LaRocca to most of the visits and doctor's appointments that LaRocca attended. LaRocca did not visit R.W. in the hospital for either of his two major surgeries, nor did she call anyone for an update on her son's condition. According to Garcia, the only communication from the Guerras regarding the surgeries was a call from Gina to Garcia four days after the July 2009 surgery. LaRocca testified that she visited R.W. as often as was possible, but could only afford the $250-$300 trip approximately once a month. She also stated that it was difficult for her to get time off from her job as a security guard, which she held from November 2008 to May 2009.

Garcia testified that LaRocca called her for an update approximately once a month for the first year R.W. was in foster care and began calling more frequently in August or September 2009. While LaRocca claimed that problems contacting Melody and Garcia made it difficult to schedule visits or receive updates, Garcia, Melody, and Shannon Bloxham, R.W.'s

guardian ad litem, all testified that they made deliberate efforts to communicate with LaRocca and keep her informed. LaRocca also stated that she was not informed of medical appointments until after they had occurred, though both Garcia and Bloxham testified to informing LaRocca of numerous appointments ahead of time, many of which LaRocca did not attend. Garcia and Melody expressed concern that despite their efforts, LaRocca did not reach out to them and did not initiate contact every two weeks as the family service plan required, even when phone calls were scheduled in advance.

The family service plan also required LaRocca to take any classes necessary to learn about R.W.'s medical needs and to "stay involved with current care and progress of R.W. through constant contact with caregivers and medical staff." Dr. Aronin testified that she gave LaRocca a pamphlet and a website containing information about her son's injuries when she came for R.W.'s visit. Though LaRocca claims Dr. Aronin told her she could find all the information she needed online, Dr. Aronin testified that the pamphlet and website were not enough to fully inform LaRocca. She stated that parents learn how to care for a child like R.W. through attending the child's doctor's appointments and asking questions, because there are no parenting classes available specific to R.W.'s needs. Garcia testified that though neither the Department nor any doctors prevented LaRocca from calling R.W.'s doctors directly or attending any of R.W.'s appointments, she attended no more than one appointment with each doctor. LaRocca did not ask questions during any of the four doctor's visits she did attend.

The Department alleges that because of this lack of commitment to learning about R.W.'s condition and care, LaRocca does not have the knowledge or understanding necessary to provide a safe home environment for her son. This inability to medically care for R.W. was

evidenced, according to the Department, during LaRocca and Gina's first unsupervised visit with R.W. in September 2009. During the visit, LaRocca and Gina changed R.W.'s clothes from a t-shirt, shorts, and no socks to a t-shirt, jeans, and socks while at the mall. After the visit, Melody noticed that R.W. was not acting himself, and his neurologist stated at trial that he believed R.W. became overheated and suffered a seizure during LaRocca's visit. Neither LaRocca nor Gina noticed anything abnormal, and LaRocca testified that she did not think the seizure occurred while in her care.

Though Garcia stated that she had previously given instructions to LaRocca emphasizing the importance of monitoring R.W. for overheating, LaRocca admitted that prior to the September 2009 visit, which occurred over a year after R.W.'s injuries, she did not understand that if R.W. got too hot, he may have a seizure. Garcia testified that LaRocca had not taken the necessary steps to assure R.W.'s safety. She said that after the incident, LaRocca seemed very defensive, stating, "I don't know how jeans can cause a seizure. I can dress my child in whatever I want. If I want him to run around naked, I'll do that . . . ." After the visit and on R.W.'s neurologist's recommendation, the court reduced LaRocca's visitation to one two-hour unsupervised visit per month, with any additional supervised visits to be granted at the Department's discretion.

At the end of 2009, the Department modified its plans from reconciliation to termination on the grounds that LaRocca knowingly placed R.W. in conditions which endangered his physical or emotional well-being, constructively abandoned R.W., and failed to comply with the family service plan. *See* Tex. Fam. Code Ann. § 161.001(D), (E), (N), (O) (West Supp. 2009). The Department alleges that LaRocca failed to seek the information necessary to learn about R.W.'s medical needs and proper care, failed to maintain constant contact and communication with R.W.'s

9

caregivers and medical staff, and did not demonstrate that she could meet R.W.'s basic needs or create a safe home for him. The jury found that both LaRocca's and Worley's parental rights should be terminated, and LaRocca appeals, challenging the legal and factual sufficiency of the evidence.

### STANDARD OF REVIEW

In reviewing the evidence for legal sufficiency in parental termination cases, we must look at all the evidence in the light most favorable to the jury's finding and determine whether a reasonable trier of fact could have formed a firm belief or conviction that the grounds for termination were proven. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so, and disregard all evidence that a reasonable factfinder could have disbelieved or found to be incredible. *Id.* We may not substitute our judgment for the jury's, and we must defer to the jury's determinations of the credibility of the witnesses, the weight to be given the testimony, and the resolution of evidentiary conflicts. *City of Keller v. Wilson*, 168 S.W.3d 802, 819, 822 (Tex. 2005).

Evidence is factually sufficient in termination cases if the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the Department's allegations. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). This standard "retains the deference an appellate court must have for the factfinder's role." *Id.* at 26. In a factual-sufficiency review, we may not pass upon the witnesses' credibility or substitute our judgment for that of the jury, even if the evidence would support a different result. *Landry's Seafood House-Addison, Inc. v. Snadon*, 233 S.W.3d 430, 436 (Tex. App.—Dallas 2007, pet. denied).

**DISCUSSION**

In order for a court to terminate parental rights, the Department must show, by clear and convincing evidence, that at least one of the twenty statutory grounds for termination applies and that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001.

The jury was asked whether LaRocca's parental rights should be terminated under sections 161.001(1)(D), (E), (N), or (O) of the Texas Family Code. Sections 161.001(1)(D) and (E) allow for termination if it is found that the parent (1) knowingly placed the child or knowingly allowed the child to remain in conditions which endanger the physical or emotional well-being of the child, or (2) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child. *Id*. § 161.001(1)(D), (E). Section 161.001(1)(N) sets out constructive abandonment as a ground for termination, requiring clear and convincing evidence that a parent has constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department for not less than six months, and (1) the Department has made reasonable efforts to return the child to the parent, (2) the parent has not regularly visited or maintained significant contact with the child, and (3) the parent has demonstrated an inability to provide the child with a safe environment. *Id.* § 161.001(1)(N). Section 161.001(1)(O) allows for termination for a parent's failure to comply with the provisions of a court order that established the actions necessary for the return of a child removed by the Department due to abuse or neglect. *Id*. § 161.001(1)(O).

In a termination case, it is appropriate to submit the termination question to the jury in the form of a broad-form question. *Trevino v. Texas Dep't of Protective and Regulatory Servs.*, No. 03-01-00038-CV, 2002 Tex. App. LEXIS 1347, at *6 (Tex. App.—Austin 2002, pet. denied)

11

(citing *Texas Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990)). When a broad-form question is submitted, we must uphold the jury's findings if any ground for termination supports the findings. *Id.* (citing *In re M.C.M.*, 57 S.W.3d 27, 32 (Tex. App.—Houston [1st Dist.] 2001, no pet.)).

LaRocca argues that the evidence is neither legally nor factually sufficient to support termination based on any of the grounds submitted to the jury, and that the evidence is insufficient to support the finding that termination is in the best interest of R.W.

### Constructive Abandonment

Because the Department relied heavily on constructive abandonment as a ground for termination both at trial and on appeal, we will address it first. To prove constructive abandonment, the Department was required to show that it made reasonable efforts to return R.W. to LaRocca, that LaRocca did not regularly visit or maintain significant contact with R.W., that she has demonstrated an inability to provide R.W. with a safe home environment, and that R.W. was in the Department's custody for at least six months, a fact that is undisputed. *See* Tex. Fam. Code Ann. § 161.001(1)(N).

The Department presented testimony suggesting that it made reasonable efforts to return R.W. to LaRocca. Garcia testified that the Department gave LaRocca many chances to become involved with R.W.'s medical care and learn the information needed to care for R.W. She further testified that had LaRocca regularly visited R.W., she would have been given more time with her son and may have been eligible for a "monitor and return," when a child is placed back with the parents while still in the Department's custody and monitored for progress.

12

To prove that LaRocca did not visit regularly or maintain significant contact with R.W., the Department presented evidence that LaRocca visited R.W. only sixteen times in seventeen months. She failed to visit R.W. after either of two major surgeries, attended four out of over one hundred doctor's appointments, and called for news of her son only once a month for an entire year. Garcia testified that, in her opinion, LaRocca did not regularly visit R.W. nor did she maintain significant contact with him. Bloxham agreed, testifying that LaRocca's sixteen visits do not constitute significant contact given the circumstances. The Department also presented the testimony of an attachment expert, Janie Cravens, who stated that, based on the age of R.W. when he was removed and the number and length of visits, not only is R.W. not emotionally attached to LaRocca, he is likely not even familiar enough to recognize her. Cravens further testified that one hour per week, LaRocca's allotted visitation, would have created a familiarity in the relationship not present in her less-than-monthly visits. While we acknowledge both the difficulties LaRocca faced in visiting R.W. and her testimony that she saw her son as often as possible, we must conclude that the evidence is legally and factually sufficient to find that LaRocca failed to regularly visit or maintain contact with R.W.

The Department also presented testimony suggesting that LaRocca demonstrated an inability to maintain a safe home environment for R.W. Garcia testified that she felt reunification risked physical harm to R.W. due to LaRocca's lack of knowledge and understanding regarding his care. Bloxham testified that she has not seen a dedication to R.W. in her interactions with LaRocca. Dr. Aronin testified that R.W.'s caregiver "has to be knowledgeable enough and aware enough of him to be able to know when things are going wrong. . . . You have to know [R.W.] and you have to be aware of changes in his behavior." She stated that R.W. needs a caregiver who will not only

13

get him to his various appointments, but will also practice his physical, occupational, and speech therapy exercises at home. According to Dr. Aronin, R.W.'s progress is dependent on at-home continuation of exercises done during therapy and requires assistance and stimulation because R.W. is "starting out life with . . . maximum deficits . . . and so he can't be just put in a crib and sat in a corner and just fed when he cries and change his diaper. He needs somebody who is going to be doing the things and following through with what the therapists are doing." Dr. Aronin testified that she was concerned that LaRocca and Gina did not fully understand the implications of R.W.'s injuries and the significant care he will need for the rest of his life. The Department also presented evidence that at the hearings prior to trial, the court ordered R.W. to remain in foster care because "neither the child's parent(s) nor any other person . . . is willing and able to provide the child with a safe environment."

LaRocca cites *In re A.S.*, 261 S.W.3d 76 (Tex. App.—Houston [14th Dist.] 2008, pet. denied), in support of her claim that courts have been reluctant to find constructive abandonment when parents make an effort to maintain contact with their children. *A.S.*, however, is distinguishable from the present situation because the mother in that case was prevented from seeing her children due to incarceration. *Id*. at 89. While the mother in *A.S.* could not visit her children from jail, she testified that she regularly visited them prior to becoming incarcerated, wrote to them often while in jail, and provided the department with a list of alternate caregivers for the children. *Id*. Despite her lack of contact with the children during her incarceration, the trial court found insufficient evidence of constructive abandonment.[8] *Id*. Here, LaRocca was not prevented from

---

[8] The *A.S.* court found that the evidence was sufficient to support the trial court's finding that the father failed to maintain contact when he only visited his children once in three months before

14

seeing her son due to incarceration, nor did she exhibit the same level of persistence in maintaining contact as that shown by the mother in *A.S.* Additionally, we can distinguish this case from *A.S.* in that Dr. Aronin, Melody, and Garcia all testified that R.W.'s fragile medical state requires much more parental involvement, attention, and training than a non-injured child. The children in *A.S.* were healthy and did not require this heightened medical care.

Though we recognize that LaRocca made what appear to be good-faith efforts to comply with the family service plan and provide for the needs of her son, the jury was entitled to find that these good intentions were outweighed by evidence that LaRocca is unable to provide for R.W.'s medical needs and maintain a safe home environment. Looking at the evidence in the light most favorable to the jury's verdict, we conclude that the evidence was legally sufficient to support constructive abandonment as a ground for termination. Viewing the evidence in a neutral light, as we must in a factual-sufficiency review, the evidence in LaRocca's favor—the sixteen visits and four doctor's appointments attended—would not prevent a reasonable factfinder from forming a firm belief or conviction that LaRocca constructively abandoned R.W. As a result, we hold that the evidence is factually sufficient to determine that statutory grounds exist for terminating LaRocca's parental rights under part (N) of family code section 161.001(1).

As only one ground is required to support a termination of parental rights, we need not address LaRocca's arguments challenging the sufficiency of the evidence regarding subsections (D), (E), and (O) of section 161.001(1) of the family code. *See In re DM*, 58 S.W.3d 801, 813 (Tex.

---

becoming incarcerated. *In re A.S.*, 261 S.W.3d 76, 89 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). The difference, it seems, lies in the amount of contact each parent had with the children prior to incarceration.

App.—Fort Worth 2001, no pet.) (declining to address other grounds after upholding termination on one ground under section 161.001(1)).

### *Best Interest of the Child*

In addition to a predicate ground for termination, the Department must also establish by clear and convincing evidence that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(2). Nonexclusive factors that the trier of fact may use in determining the best interest of the child include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). These factors are not exhaustive, and some may be inapplicable in certain cases. *Id.* The Department need not prove all of these factors to prove by clear and convincing evidence that termination is in the child's best interest. *In re C.H.*, 89 S.W.3d at 27. Evidence of one factor may be sufficient to support a finding of termination. *In re J.O.C.*, 47 S.W.3d 108, 115 (Tex. App.—Waco 2001, no pet.).

LaRocca argues that there is no evidence to support the jury's finding that termination was in R.W.'s best interest because LaRocca had taken a parenting class, obtained information regarding R.W.'s special needs, and had created a plan to care for R.W. in Brownsville. Dr. Aronin,

16

Garcia, and Bloxham, however, all testified that termination of LaRocca's parental rights was in R.W.'s best interest. Dr. Aronin testified that the Cowgers are "outstanding," very attentive and involved, and that R.W. is happy in their care. She also testified that R.W.'s best chance of obtaining his maximum potential would be in the care of the Cowgers. Garcia testified that termination was in R.W.'s best interest because he has formed a bond with the Cowgers, that they have always taken excellent care of him, and that he would be safe there. She further stated that she gave LaRocca many chances to maintain contact, keep up with doctor's appointments, and become educated regarding R.W.'s condition, but that she failed to show progress in learning how to properly care for R.W.

Bloxham testified that she believed it was in R.W.'s best interest to terminate parental rights because if he is adopted, he will receive Medicaid and special services. She further stated that adoption would create permanency for R.W. that would not exist if R.W. remained in the custody of the Department. She testified that she had not seen the commitment from LaRocca and Gina necessary for reconciliation or placement in the Guerras' home to be in R.W.'s best interest. Finally, Janie Cravens, the attachment expert, testified that R.W. showed fourteen out of eighteen markers of attachment with the Cowgers and that they are attuned and responsive to R.W.

While the jury may not terminate parental rights merely because a child might be better off living elsewhere, *see D.M.*, 58 S.W.3d at 814, viewing the facts in the light most favorable to the jury's finding, evidence exists suggesting that LaRocca lacks the experience and knowledge necessary to provide for R.W.'s needs and that termination is in R.W.'s best interest. Furthermore, considering the evidence and leaving matters of credibility to the jury, a trier of fact could have

17

reasonably found by clear and convincing evidence that termination was in R.W.'s best interest. For these reasons, we cannot hold that the jury's finding regarding R.W.'s best interest is unsupported by the evidence.

Having carefully reviewed the entire record, we conclude that the evidence is both legally and factually sufficient to support the jury's findings that (1) statutory grounds for termination exist under section 161.001(1)(N) and (2) termination is in the child's best interest.

## CONCLUSION

Because the evidence is legally and factually sufficient to support the jury's finding terminating LaRocca's parental rights, we affirm the trial court's order of termination.

_____

Diane M. Henson, Justice

Before Justices Patterson, Puryear and Henson

Affirmed

Filed:   November 4, 2010

18