

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-14-00091-CV

_____


IN THE INTEREST OF A.T., A CHILD



On Appeal from the 307th District Court
Gregg County, Texas
Trial Court No. 2013-955-DR



Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Justice Burgess

# MEMORANDUM OPINION

For twelve years, Anthony[1] was almost totally uninvolved in the life of his son, A.T. After A.T. was removed from his mother's home for neglect and Anthony continued his years-long pattern of nonsupport and noninvolvement, he lost his parental rights to A.T. in a bench trial in Gregg County.[2]  On appeal, Anthony challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination was in the best interest of A.T. Anthony does not contest the trial court's findings regarding termination under the grounds set out in subsections (N), (O), and (P) of Section 161.001(1) of the Texas Family Code.[3]  We affirm the judgment of the trial court because the evidence is sufficient to support the finding that termination was in the best interest of the child.

## I.  Standard of Review

Texas courts show great respect for the biological bond between parent and child, recognizing that the "natural right which exists between parents and their children is one of constitutional dimensions." *In re J.W.T.*, 872 S.W.2d 189, 194–95 (Tex. 1994); *In re J.J. & K.J.*, 911 S.W.2d 437, 439 (Tex. App.—Texarkana 1995, writ denied).  Consequently, termination proceedings are strictly construed in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20

---

[1]We will refer to appellant as "Anthony," the child as "A.T.," A.T.'s mother as "Alice," A.T.'s older brother as "X.L.," and A.T.'s paternal grandmother as "Bobbie"—all ficticious names—in accordance with Rule 9.8 of the Texas Rules of Appellate Procedure. *See* TEX. R. APP. P. 9.8.  Since X.L. is not Anthony's son, he is not a party to this case.

[2]The trial court also terminated the parental rights of Alice, who has not appealed.

[3]The trial court's order of termination found that there was clear and convincing evidence to support termination of Anthony's parental rights under each of subsections (N), (O), and (P) of Section 161.001(1) of the Texas Family Code and that termination was in the best interest of A.T.  *See* TEX. FAM. CODE ANN. § 161.001(1) (N), (O) & (P); (2) (West 2014).

(Tex. 1985); *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007, pet. denied). However, we also recognize that "'the rights of natural parents are not absolute; protection of the child is paramount. . . . The rights of parenthood are accorded only to those fit to accept the accompanying responsibilities.'" *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994)). The child's emotional and physical interests will not be sacrificed merely to preserve parental rights. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

Terminating parental rights under the Family Code requires proof by clear and convincing evidence. TEX. FAM. CODE ANN. § 161.001(1). Clear and convincing evidence is "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2014); *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). In reviewing legal sufficiency, we "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d at 266. When the trial court is the fact-finder, "we assume that the trial court resolved disputed facts in favor of its finding if a reasonable fact-finder could do so, but disregard all evidence that a reasonable fact-finder could have disbelieved or found to have been incredible." *In re K.W.*, 335 S.W.3d 767, 770 (Tex. App.—Texarkana 2011, no pet.) (citing *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009)).

In reviewing for factual sufficiency, we determine "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *C.H.*, 89 S.W.3d at 25. If we find, after reviewing the entire record, that "the

3

disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *J.O.A.*, 283 S.W.3d at 344. However, if the fact-finder could have reasonably resolved the conflicts in the evidence and formed a firm conviction that the State's allegations were true, then the evidence is factually sufficient and the termination findings must be upheld. *C.H.*, 89 S.W.3d at 18–19.

## II.    The Evidence at Trial

The Texas Department of Family and Protective Services (TDFPS) opened this case on April 10, 2013, when it received a report of alleged physical neglect of A.T. and his older brother, X.L., by their mother, Alice. However, both TDFPS' involvement with Alice and A.T., as well as Anthony's absence from the home, began years earlier. A.T. was born January 9, 2003. Since neither Anthony nor Alice attended the final termination hearing,[4] it is unclear from the evidence how long Anthony resided with A.T. and Alice. Jessica Galindo, a TDFPS investigator, testified about her investigation and what TDFPS records showed regarding involvement with Alice, A. T. and Anthony. The following history of TDFPS's involvement with this family is derived from Galindo's testimony.

According to TDFPS records, a report of Anthony physically abusing X.L. was filed in June 2003, but the case was closed with no action on the part of TDFPS. Twice in 2005, TDFPS received reports of neglectful supervision of A.T. and X.L. by Alice, but those reports were

---

[4]Alice executed an affidavit of voluntary relinquishment of parental rights before trial. *See* TEX. FAM. CODE ANN. § 161.103 (West 2014). Although Anthony was represented by his attorney at trial, no explanation was given for his absence.

4

never confirmed. In 2007, Alice was once again reported for neglectful supervision of A.T. and X.L. During the TDFPS's investigation of that report, Alice admitted using drugs and tested positive for cocaine.[5] Based on these admissions, the children were removed from the home and placed with an aunt.

In 2009, another case was opened to investigate neglectful supervision of A.T. and X.L. by Alice. More specifically, TDFPS received a report that Alice had been driving under the influence of drugs and alcohol. At that time, Alice tested positive for marihuana and benzodiazepines.[6] The children were once again placed outside the home. In July 2010, Alice was arrested for assault after threatening her then boyfriend with a gun and knife. A report was filed with TDFPS against Alice for neglect and abuse since she committed this act in the presence of A.T. and X.L.[7] The children were once again removed from the home, first in foster care, and then with their aunt. However, in December 2010, the aunt notified TDFPS that she would no longer be able to care for them, and they were returned to foster care until January 2012.

Galindo testified that although Anthony would have been contacted for all of these cases, the records do not show that he ever paid any support for A.T. or that he visited him or had any

---

[5]Cocaine is a controlled substance under Section 481.102(3) of the Texas Health and Safety Code. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.102(3)(D) (West 2010).

[6]Both marihuana and benzodiazepines are controlled substances under Section 481 of the Texas Health and Safety Code. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.121 (West 2010); § 481.104(a)(2) (West Supp. 2014).

[7]Alice had previously been convicted of misdemeanor assault causing bodily injury to a family member occurring in October 2006.

other involvement with A.T.[8]  Further, she testified that Anthony would have been asked to participate in services when the children were placed in conservatorship in 2010.  However, TDFPS records do not indicate that Anthony ever participated in any services, and they show no significant involvement by Anthony in A.T.'s life.  In January 2012, Anthony was given joint conservatorship over A.T., but A.T. was not placed with him.

Anthony's absence and lack of involvement in A.T.'s life may be due to the significant amount of time he was incarcerated.  During A.T.'s lifetime, the evidence shows that between December 2003 and April 2006, Anthony assaulted and caused bodily injury to Alice three times.  Anthony was convicted for each of these assaults and was sentenced to serve a total of one year, two hundred and ten days in jail.  Further, in May 2008, Anthony was convicted of possession of marihuana, and in August 2009, he was convicted of deadly conduct.  For these offenses, he was sentenced to 170 and 250 days in jail, respectively. Then, in August 2010, Anthony was convicted of possession of a controlled substance (methamphetamine) with intent to deliver and evading arrest.  He was sentenced to serve two years in state jail for each of these convictions, with the sentences running concurrently.  Finally, in March 2013, shortly before the TDFPS opened its most recent case, Anthony was convicted again for evading arrest and sentenced to serve fifteen months in state jail.  Thus, Anthony appears to have been incarcerated for nearly one-half of A.T.'s life before the TDFPS's April 2013 case was opened.

---

[8]Anthony's noninvolvement in A.T.'s life during this period is also supported by A.T.'s school records.  Anthony is only mentioned twice.  He is identified as A.T.'s father, with no contact information, in a registration form, and also with an illegible cell phone number in an authorization to secure emergency medical treatment of a student, which is signed by Alice.

In April 2013, A.T. and his brother were once again living with Alice. Galindo testified that TDFPS got involved as the result of a report of physical neglect of A.T. and X.L. by Alice. The report alleged that the home in which A.T. was living had no electricity or running water, that there was no food in the home, and that the family had been evicted. In addition, it was alleged that Alice was using controlled substances and that she and her boyfriend, Darius, were having physical fights. Galindo confirmed these reports through interviews with A.T. and X.L. At the time, Anthony was in the Gregg County Jail serving a sentence for evading arrest. Galindo talked with him there and, although he expressed an interest in caring for A.T., he did not think he would be released from jail before February 2014. He also expressed concerns about A.T. being returned to Alice and thought the best place for A.T. was with Anthony's mother, Bobbie. A.T. was removed from the home on May 7, 2013, and initially placed in foster care. He was then placed for a time with Bobbie, but later again placed in foster care in Henderson. In June 2014, A.T. was placed in his current foster home in Desoto.

Anthony got out of jail around the end of May 2014. Dionne Jordan, a TDFPS caseworker, testified that, although she tried to call him after he got out of jail, he would not answer his telephone or return her calls. She talked with him by telephone in late July and met with him in person in her office in August 2014. At the in-person meeting, she reviewed with him what would be required under the service plan, including parenting classes, stable employment, a physical address, counseling, and random drug tests. Anthony told her that he was married and living with his wife and two children. He claimed his current wife would agree to accepting A.T. into their home, but this was never confirmed since Anthony never provided

Jordan with his wife's contact information. Jordan also discussed with Anthony the possibility of visiting with A.T., but Anthony never tried to exercise his right to visit him.

After a court hearing, Anthony submitted to a drug test on August 14; he tested positive for opiates, phencyclidine (PCP) and codeine.[9] Jordan testified that she talked with Anthony one time by telephone after his August 2014 drug test. She asked him to come in to her office so they could start the service plan, but he made excuses and would not meet with her. She testified that Anthony never gave her a physical residential address, never took the parenting classes, never went to counseling, and never paid any child support for A.T. during the pendency of the TDFPS case. She also stated that she had no knowledge of him maintaining gainful employment during that time.

There was also testimony regarding the detrimental emotional and psychological effects the long years of instability and neglect had had on A.T., as well as the progress he has made in his current foster home. Galindo testified that from pre-school through the fourth grade, excluding the period from April 2010 to January 2012 when he was in TDFPS conservatorship, A.T. had attended ten different schools. Although the school records reflected significant behavioral problems during this period, she testified that there was no record of any response from either Alice or Anthony. She opined that attending ten different schools in six years would have a very destabilizing psychological effect upon A.T.

Bobbie testified that she kept A.T. for a year when he was four. A.T. also stayed with Bobbie for a short time after this case began. However, after he talked with Alice on the

---

[9]Opiates, phencyclidine and codeine are controlled substances under the Texas Health and Safety Code. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 481.102(1), (3)(A) & (8), 481.105(1) (West 2010).

8

telephone, he refused to cooperate and hit Bobbie in the face; Bobbie immediately had him removed. Jordan testified that A.T. also had behavior issues while living in the Henderson foster home, and she explained that his behavioral issues necessitated the move from Henderson to his current foster home in Desoto. She testified that in her experience, his behavioral problems were not unusual in a child who comes from an unstable home environment.

Rose Obaze, a psychotherapist, first saw A.T. in June 2014. She testified that he displayed emotional shortcomings resulting from abuse and neglect. According to Obaze, A.T. is easily angered, hoards food at times, and can be aggressive. This was not unexpected since A.T. had lived in an unstable environment with constant fighting and was moved from relative to relative and from foster home to foster home. She believes that returning A.T. to that environment would be a further detriment to his physical and emotional well-being. His foster mom is loving, and he has a good relationship with his foster dad. He has made progress while with them, and in Obaze's opinion, if A.T. were returned to his old environment, he would spiral downward and regress.

Although A.T., like many children, has some ambivalence about where he would like to live, he has lately expressed a desire to remain with his foster family, where he feels safe and his needs are met. Bobbie agreed that the placement in Desoto is the best place A.T. has ever been, observing that up until the last few months, A.T. had been a troubled child. According to Bobbie, A.T. said to her, "Granny, it's the best place I've ever been, and I would like to stay." He is stable and happy and, in Bobbie's opinion, it would be in A.T.'s best interest to remain with the family in Desoto. Bobbie also testified that if A.T. is returned to Alice, he will not

make it, and if he is returned to Anthony, it will be even worse. She testified that Anthony does not have a stable job or stable living arrangements. Although Anthony lives in an apartment with his wife and the apartment is clean and stable for them and their two children together, Bobbie testified that Anthony's wife is the sole provider and that Anthony is only there half of the time.

Loretta Miller, A.T.'s foster mom, also testified. She and her husband have been fostering children for fourteen years. They have had many neglected children placed in their home, and she is familiar with the behaviors they exhibit. She said the behavior that A.T. exhibited when he first came, such as breaking things, was not surprising. Since coming to live with them, A.T. has calmed down a lot and is no longer breaking things. According to Miller, A.T. now smiles, asks for hugs, and generally seems happy. He gets along with the other children in the home and, although he is not perfect, he is getting better. Miller said that A.T. struggled at school initially, but she has made an effort to be there, meet with his teacher and the principal, and to let A.T. know that she is there for him. She and her husband have adopted five children and currently have four foster children, including A.T., living with them in a six bedroom house. They are willing to adopt A.T.

III. **Termination of Anthony's Parental Rights Was in the Best Interest of A.T.**

To uphold the trial court, we must determine whether TDFPS proved, by clear and convincing evidence, that termination of Anthony's parental rights was in A.T.'s best interest. *See* TEX. FAM. CODE ANN. § 161.001. There is a strong presumption that a child's best interest is served by maintaining conservatorship in a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex.

10

2006) (per curiam); *In re J.L.B.*, 349 S.W.3d 836, 848 (Tex. App.—Texarkana 2011, no pet.). However, that presumption can be overcome with clear and convincing evidence to the contrary. *J.L.B.*, 349 S.W.3d at 848.

In determining the best interest of the child, we may consider a number of factors, including:

> (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals, (6) the plans for the child by these individuals, (7) the stability of the home, (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent.

*In re K.S.*, 420 S.W.3d 852, 855 (Tex. App.—Texarkana 2014, no pet.) (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). It is not necessary to prove all of these factors as a condition precedent to parental-rights termination. *C.H.*, 89 S.W.3d at 27; *In re N.L.D.*, 412 S.W.3d 810, 819 (Tex. App.—Texarkana 2013, no pet.). Evidence relating to a single factor may suffice in a particular situation to support a finding that termination is in the best interest of the child. *K.S.*, 420 S.W.3d at 855 (citing *In re J.O.C.*, 47 S.W.3d 108, 115 (Tex. App.—Waco 2001, no pet.)). When considering a child's best interest, we may take into account that a parent is unable to provide adequate care for a child, lacks parenting skills, or exercises poor judgment. *In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.). A parent's drug abuse, which reflects poor judgment, is also a factor that may be considered when determining a child's best interest. *In re M.R.,* 243 S.W.3d 807, 820 (Tex. App.—Fort Worth 2007, no pet.). Further, the amount of contact between the parent and child, the parent's failure to provide

financial and emotional support, continuing criminal history, and past performance as a parent are all relevant in determining the child's best interest. *See C.H.*, 89 S.W.3d at 28.

In this case, there is no evidence that A.T. has ever had a real relationship with Anthony. For much of A.T.'s life, Anthony was incarcerated as a result of his assaultive behavior and involvement in illegal drugs. During the time he was not incarcerated, the evidence shows that he did not financially or emotionally support A.T. He was both physically and emotionally absent from his life. Even though Anthony had joint conservatorship, he allowed A.T. to remain under the care of Alice, who was also deeply involved in illegal drugs, exhibited violent behavior, and failed to provide adequate food and shelter for A.T., thereby placing him in physical and emotional danger. Once released from jail in May, Anthony continued using illegal drugs, failed to financially support A.T., and has never attempted to visit him. As found by the trial court, Anthony has constructively abandoned A.T. Although he expressed an interest in caring for A.T., Anthony has failed to take any action that would indicate any resolve to have a relationship with A.T., much less actually parent him. All of Anthony's past and current actions indicate that his abandonment of A.T. will continue in the future.

In contrast, the evidence shows that A.T. is now enjoying, for the first time in his life, a stable home environment where his physical and emotional needs are being met. He has loving, experienced, and involved foster parents who understand his emotional needs and who would like to adopt him. He has expressed his desire to remain with his foster parents. Even Anthony's mother believes this is the best place A.T. has ever been, and she opines that it would be in his best interest to remain there.

12

The evidence in this case shows that all of the *Holley* factors support the trial court's finding that termination was in the best interest of the child. We find there is sufficient evidence to support the trial court's finding and overrule Anthony's point of error.

We affirm the judgment of the trial court.


Ralph K. Burgess
Justice

Date Submitted:     January 29, 2015
Date Decided:       February 18, 2015