# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## ON MOTION FOR REHEARING

## NO. 03-12-00147-CV

**Angel Nuyen, Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

### FROM THE DISTRICT COURT OF BELL COUNTY, 146TH JUDICIAL DISTRICT
### NO. 248,916-B, HONORABLE RICK MORRIS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

We withdraw our opinion and judgment dated July 25, 2012, and substitute the following in its place. The motion for rehearing filed by appellant Angel Nuyen is denied.

Angel Nuyen appeals from a final order terminating her parental rights to her infant child, E.N. On appeal, Nuyen asserts that the evidence is legally and factually insufficient to support termination. We will affirm the termination order.

## BACKGROUND

Nuyen gave birth to E.N. on March 10, 2011. Four days later, the Texas Department of Family and Protective Services (the Department) filed a petition seeking to terminate her parental

rights, along with those of two alternative alleged fathers, Justin Ellebracht and Eric M'Sadoques.[1] At the time of E.N.'s birth, three other children of Nuyen had already been removed by the Department upon findings of "reason to believe" that she had sexually abused one of the children and neglectfully supervised all three.

In its original petition, the Department asserted that Nuyen committed a number of acts or omissions warranting termination of the parent-child relationship. At trial, the Department proceeded on two theories, arguing that Nuyen had (1) "constructively abandoned the child who has been in the permanent or temporary managing conservatorship of [the Department] for not less than six months, and, (i) [the Department] has made reasonable efforts to return the child to the parent; (ii) the parent has not regularly visited or maintained significant contact with the child; and (iii) the parent has demonstrated an inability to provide the child with a safe environment," *see* Tex. Fam. Code Ann. § 161.001(1)(N) (West Supp. 2011); and (2) "failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of [the Department] for not less than nine months as a result of the child's removal from the parent under chapter 262 for the abuse or neglect of the child," *see id*. § 161.001(1)(O) (West Supp. 2011).

A bench trial was held before associate judge Charles Van Orden. *See id*. § 201.005 (West 2008) (governing referral of cases to associate judges). We will detail the evidence presented at trial as it becomes relevant to our analysis of Nuyen's appellate issues. At the conclusion of

---

[1] After paternity testing determined Ellebracht to be the child's biological father, the Department dismissed its claim against M'Sadoques. Ellebracht ultimately executed an affidavit of voluntary relinquishment of parental rights, and his rights are not at issue on appeal.

evidence, the trial court found by clear and convincing evidence that the Department had established both grounds and that termination would be in E.N.'s best interest. The trial court issued a proposed order terminating Nuyen's parental rights. The district court adopted the trial court's proposal, and signed a final order terminating Nuyen's parental rights and naming the Department as E.N.'s sole managing conservator. This appeal followed.

## ANALYSIS

In her sole issue, Nuyen asserts that the evidence was legally and factually insufficient to support the trial court's findings underlying its termination order.[2]

**Standard and scope of review**

A court may terminate parental rights based on findings by clear and convincing evidence that (1) any of several alternate statutory bases for termination exist; and (2) that termination is in the best interest of the child. *See id*. § 161.001; *Holley v. Adams*, 544 S.W.2d 367, 370-72 (Tex. 1976). Clear and convincing evidence is that "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2008).

In a legal sufficiency review of a finding terminating parental rights, an appellate court reviews all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true.

---

[2] In her brief, Nuyen also complains of two asserted "procedural errors which did not affect the termination of Appellant's parental rights," but these are merely "noted, and not argued." As Nuyen has not presented argument in support of these complaints, we will not address them. *See* Tex. R. App. P. 38.1(i).

*In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *Id*. An appellate court disregards all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id*.

In a factual sufficiency review of a finding terminating parental rights, the inquiry is whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations. *Id*. A reviewing court must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *Id*. A reviewing court should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *Id*. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id*.

**Termination grounds**

As previously noted, the trial court found that two statutory grounds for termination were established by clear and convincing evidence. First, it found that Nuyen constructively abandoned E.N. under section 161.001(1)(N). Second, the court found that Nuyen had failed to comply with the provisions of her court-ordered service plan under section 161.001(1)(O). When termination is based on multiple grounds under section 161.001(1), as it was here, we must affirm the termination order if the evidence is sufficient to support any one of the grounds found by

4

the district court. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Because the court's findings regarding constructive abandonment are dispositive, we confine our analysis to the evidence material to that statutory ground. *See* Tex. R. App. P. 47.1.

In order to prove constructive abandonment, the Department must establish by clear and convincing evidence that (1) it had a permanent or temporary managing conservatorship of the child for at least six months; (2) it made reasonable efforts to return the child to Nuyen; (3) Nuyen did not regularly visit or maintain significant contact with the child; and (4) Nuyen demonstrated an inability to provide the child with a safe environment. Tex. Fam. Code. Ann. § 161.001(1)(N); *In re M.R.J.M.*, 280 S.W.3d 494, 505 (Tex. App.—Fort Worth 2009, no pet.). Nuyen does not dispute the first element. She contends, however, that the evidence is legally and factually insufficient to support the three remaining elements. We disagree.

### *"Reasonable efforts"*

Nuyen argues that the Department presented legally and factually insufficient evidence to establish by clear and convincing evidence that the Department made reasonable efforts to return E.N. "other than preparation of a service plan; several unanswered phone calls; one day trip to Rusk, and one or two courtesy visits." However, "[t]he State's preparation and administration of a service plan for the parent constitutes evidence that the State made reasonable efforts to return the child to the parent." *In re M.R.J.M.*, 280 S.W.3d at 505.

Nuyen's service plan, which was in evidence, required her to "provide and maintain a safe, clean and appropriate home . . . free of any health hazards throughout the case," "to allow announced or unannounced home visits by the Department," to pay child support if ordered by the

5

court, and "[i]f not court-ordered . . . to assist in supporting his [sic] children" in ways "not limited to monetary assistance." Nuyen was also required to "participate in supervised visits with [E.N.]," and to "call the worker, as applicable, 24 hours in advance if she cannot come to a visit." Her plan warned that "[v]isitation will be reassessed if there are multiple absences." Nuyen was also required to "contact the caseworker by phone, letter or email every two weeks about her status."

The Department's sole witness, Cathy Rothas, a conservatorship worker, testified that Nuyen had failed to complete the service plan. Rothas believed, and Nuyen's testimony confirmed, that Nuyen was aware of the Department's intention to "seek termination and allow the child to be adopted" if she did not comply with her service plan. According to Rothas, Nuyen never called her during the eight months that Rothas served as her caseworker, and only once initiated communication to set up a visit. Rothas claimed that her sole contact with Nuyen came during her visits with E.N., and "other than that, with the exception of one day when she returned several texts. No contact."

Rothas asserted that Nuyen had not satisfied the visitation requirements of her service plan. Over a period of eleven months, Rothas claimed that Nuyen visited E.N. five times for a total of approximately eight hours. Two of the visits occurred during Nuyen's scheduled court hearings on April 28, 2011 and July 21, 2011. Nuyen visited E.N. twice at the CPS office on May 27, 2011 and June 3, 2011, and "was a no show" for another scheduled visit in August. Nuyen told Rothas that she missed the appointment because "her brother had a flat tire and was waiting for money." Her last visit was on September 21, 2011. Rothas stated that Nuyen offered no explanation as to why she did not visit more. Rothas testified to the importance for infants to have "consistent contact"

with their caregivers for "bonding purposes primarily so that the child bonds to their caregiver and the caregiver bonds to the child."

According to Rothas, in October 2011, she texted Nuyen to let her know the court was holding a hearing regarding visitation rights. She received no response. When Nuyen did not attend, the court postponed the hearing for one week. At the termination hearing, Nuyen claimed that she missed the first visitation hearing "because the radiator on the Oldsmobile was cracked," and she had no way of fixing it. Nuyen acknowledged sending and receiving texts to Rothas about missing the hearing in the morning. The Department's attorney noted an additional text Rothas sent Nuyen in the afternoon stating, "The judge scheduled a hearing next week at 1:30 to review visitation." Nuyen claimed that she never received that text. Rothas claimed that she informed Nuyen of the rescheduled date, but Nuyen again failed to appear, prompting the court to abate her visitation rights.

According to Rothas, she left a message for Nuyen, informing her that the court had abated her visitation rights "until she could come to court and tell [the Judge] why she didn't come to court." When Nuyen did not respond, Rothas claimed, she texted her and then sent her a letter. Again, she claimed that she "did not hear anything." Nuyen claimed that she was unaware of the second hearing, that she did not have a phone, and that she could not get in contact with Rothas. Nuyen asserted that after she learned about her abated visitation rights through her therapist, she tried to set up a conference call with Rothas through the therapist. She claimed that she had no idea the purpose of the hearing was to review her visitation rights. She also claimed that she tried to pass a message to Rothas through a courtesy worker who visited her house, but never heard back from the worker. At the time of trial, Nuyen had not seen E.N. in four and a half months.

7

Nuyen admitted that she could have called Rothas more often, but explained that she "didn't have access to a phone all the time." Nuyen testified that her phone was shut off multiple times for non-payment, and then stolen by George Holcomb, her former roommate. M'Sadoques claims that he saw Nuyen initiate phone calls to the Department "once or twice a week at least if not more," but he did not stay to listen because it was a "personal matter." Nuyen explained why she was not more persistent in attempting to contact the Department:

A: They should be getting my message and should get back to me. Before in a previous case I had called [the caseworker] on many occasions and I got told that she didn't . . . need to know my exact moves, which was her exact words to me.

Q: But this wasn't the worker in your previous case.

A: She was the one at the beginning of the case when I was with—

Q: All right. Well, have you tried to make contact with Mr. Lockett, the children's guardian ad litem at the present?

A: No . . . . [W]ith everything that had happened I didn't have Mr. Lockett's number, and my mother was actually trying to get Mr. Lockett's number and couldn't get ahold of [Rothas] or anybody else in that matter.

Rothas also did not believe that Nuyen had the ability to provide E.N. with a safe environment. At the time of E.N.'s birth, Nuyen lived in Rusk with M'Sadoques and Holcomb, who Rothas claimed killed his own father-in-law in retaliation after the father-in-law killed Holcomb's wife. In October 2011, police were called to Nuyen's house because of a fight between Nuyen and Holcomb. After the fight, Nuyen testified that she obtained a protective order against Holcomb, and she has not voluntarily allowed him back in the house since. However, she claimed that she went to stay with a friend in Dallas because she was afraid Holcomb might return. She claimed that he

8

did in fact return, breaking into her house and vandalizing her property. Nuyen believed that she did everything she could to get Holcomb out of her life, but admitted that she was not sure of his current whereabouts, that she had not seen or heard from him since the last incident at her house, that he remained a danger to her, and that he could be a danger to E.N.

Similarly, M'Sadoques was arrested for disorderly conduct following a fight with Nuyen. Nuyen and M'Sadoques both attempted to downplay this arrest, explaining it began as an argument about chores in a grocery store parking lot. M'Sadoques admitted to grabbing Nuyen, but claimed that it was not in a "violent way." When a bystander reported the fight, police arrested M'Sadoques because, according to Nuyen, they had a "no tolerance policy." Nuyen pawned her laptop to bail him out of jail. She claimed that this was the only instance of violence between them.

Rothas testified that, aside from visitation and maintaining a safe and appropriate home, Nuyen complied with her service plan. Nuyen and M'Sadoques testified that they believed Nuyen had "done everything that was asked of her." Rothas detailed her numerous attempts to contact Nuyen and Nuyen's failure to respond, as well as Nuyen's loss of her visitation rights. Regarding her home, which we discuss in greater detail below, Nuyen acknowledged that her house had been vandalized by Holcomb, that she was unaware of his current whereabouts, and that he could be a danger to E.N. if she were returned. We conclude there was legally and factually sufficient evidence that the Department made reasonable efforts to return E.N. to Nuyen.

### *"Regular visitation"*

Nuyen next argues that she regularly visited E.N. until her visitations rights were abated by the court on October 20, 2011. The trial court heard evidence that in the first

eleven months of her life, Nuyen visited E.N. five times for a total of approximately eight hours. Two of those visits coincided with court hearings. Nuyen explained that, prior to October 20, 2011, she would have visited more, but she had financial difficulties and problems with transportation. While she missed a visit and a hearing because of car problems, M'Sadoques testified that he and Nuyen were able to borrow cars on at least two separate occasions to travel to Dallas to attend a wedding and visit a doctor. Further, Nuyen claims that she did not call her caseworker more frequently, or at all, because she "didn't have access to a phone all the time." M'Sadoques testified, however, that he spoke via phone with Nuyen "every few days" from early September through early November while he was away for his job.

Nuyen maintains that the four and a half months during which she failed to maintain any contact with E.N. cannot be counted against her because the court had abated her visitation rights. In support, Nuyen relies on *In re D.T.*, in which the appellate court found no evidence of constructive abandonment though the parent had not been able to visit her child during her period of incarceration per department policy. 34 S.W.3d 625, 633 (Tex. App.—Fort Worth 2000, pet. denied). Evidence demonstrated that the parent wrote or called her caseworker at least seven times over a period of as many months while she was incarcerated to inquire how the child was doing, ask for pictures of him, and request visits with him. *Id*. at 629. Under these circumstances, the court concluded the parent at least *attempted* to visit regularly or maintain significant contact with the child. *Id*. at 633.

We consider the present case closer to the Houston Court of Appeals's holding in *Quiroz v. Department of Family and Protective Services*, No. 01-08-00548-CV, 2009 WL 961935, at *6-7 (Tex. App.—Houston [1st Dist.] Apr. 9, 2009, no pet.) (mem. op.). In that case, the parent

10

made a similar argument that, for purposes of constructive abandonment, the court should not consider time when a court order was in place preventing visitation. *Id*. The district court ordered no contact between the parent and child "until such time as [the parent's] other two children were brought into [the Department's] custody," because the Department had been unable to locate the children. *Id*. at *6. This condition did not mean the parent could not see her child "based on factors beyond her control." *Id*. Instead, "by the very nature of the order," the parent "only had to come to court in order to have the order lifted." *Id*.

Similarly, Nuyen lost her visitation rights because of her failure to appear at two court hearings concerning her visitation rights. Rothas claimed that she informed Nuyen that her visitation rights were abated "until she could come to court" and explain why she missed her hearings. After learning that her visitation rights had been abated, Nuyen claimed that she tried to set up a conference call with Rothas through her therapist and pass a message to Rothas through a courtesy worker, but Rothas testified that she heard no response from Nuyen. We conclude the evidence was legally and factually sufficient for the factfinder to determine that Nuyen failed to regularly visit or maintain significant contact with E.N.

### *Inability to provide safe environment*

Finally, Nuyen contends that there is no competent evidence that Nuyen was unable to provide E.N. with a safe environment. In addition to the previously discussed testimony concerning Nuyen's violent encounters with M'Sadoques and Holcomb, the court heard testimony regarding Nuyen's current living conditions. Rothas visited Nuyen's home on November 17, 2011 with E.N.'s guardian ad litem, Michael Lockett, because they "hadn't heard from [Nuyen] in a very long time."

When they arrived, Rothas claimed that Nuyen's home was in "an extreme case of disrepair; two dogs chained up out front with a little bit of water; some animals caged in the side yard; trash around the home." According to Rothas, she sent a text to Nuyen that they were coming to the house. Nuyen quickly replied that "she was not home. She was in Dallas for a wedding; and that she just got her phone back. And said that . . . she would meet with [them] the next day . . . one town over from Rusk." Rothas stated that this was "the first time that [Nuyen had] replied to a text from [Rothas] in months." Rothas also noted that the date was a Thursday, an unusual wedding day.

When questioned why she was able to attend a wedding in Dallas, but not visit E.N., Nuyen explained that she had "other transportation" to the wedding, M'Sadoques was out of town, and people did not want her to stay at the house alone for fear that Holcomb might break in again. She claimed that the mess in the yard was the result of Holcomb's vandalism, which appears to have occurred in mid-to-late October 2011. The mess was still there on November 17, 2011 when Rothas and Lockett visited, but Nuyen claimed that it had since been cleaned up. Additionally, M'Sadoques asserted, contrary to Nuyen's testimony, that he and Nuyen were at a doctor's appointment in Dallas when Rothas and Lockett visited. He further claimed that they borrowed a car for the trip because their car was not working. He also claimed that he drove Nuyen to the wedding in Dallas, also in a borrowed car, but was unable to identify the date of the wedding trip.

Rothas asserted that she saw Nuyen's car in the driveway and believed Nuyen was home. According to Rothas, she and Lockett knocked on the door and waited for "15 or 20 minutes," but no one answered. She claimed that they returned an hour later, but again, no one answered the door. Rothas took pictures of Nuyen's home, which were admitted into evidence. Rothas admitted that she had never been inside Nuyen's house. Rothas also claimed that Nuyen

12

would not let a courtesy worker inside the house when she visited. Nuyen denied this point, testifying that she allowed a courtesy worker in her house, and that a second worker visited but did not ask to come inside. Rothas also indicated that caseworkers visited the house in October 2011 as part of another CPS referral and reported the house was "unsuitable." Rothas claimed that Nuyen never contacted Rothas to schedule another visit to her house.

While Nuyen disputed some points of Rothas's account, the factfinder was entitled to disbelieve Nuyen's explanations, particularly in light of the apparent inconsistencies between Nuyen's and M'Sadoques's telling of certain events. After reviewing the record, we are satisfied that there was sufficient evidence to conclude Nuyen failed to provide a safe environment for E.N.

This and other evidence would allow a reasonable factfinder to form a firm belief or conviction that Nuyen constructively abandoned her child. We conclude that the above evidence is legally and factually sufficient to support an affirmative finding under section 161.001(1)(N).

**Best interest**

We must also determine whether the evidence is sufficient to support a finding that termination of Nuyen's parental rights was in the best interest of the child. *See Holley*, 544 S.W.2d at 371. The best interest of the child is assessed using a non-exhaustive list of factors. *Id*. at 372. These factors include the child's wishes, the child's emotional and physical needs now and in the future, emotional or physical danger to the child now and in the future, the parenting abilities of the party seeking custody, programs available to help that party, plans for the child by the party seeking custody, the stability of the proposed placement, the parent's conduct indicating that the parent-child relationship is improper, and any excuses for the parent's conduct. *Id*. The Department

need not prove all of the *Holley* factors as a "condition precedent" to termination, and the absence of some factors does not bar the factfinder from finding by clear and convincing evidence that termination is in a child's best interest. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). No one factor is controlling, and the facts of a case may mean that evidence of one factor is sufficient to support a finding that termination is in the child's best interest. *In re J.O.C.*, 47 S.W.3d 108, 115 (Tex. App.—Waco 2001, no pet.). Permanence is of paramount importance in considering a child's present and future emotional and physical needs. *Dupree v. Texas Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 87 (Tex. App.—Dallas 1995, no writ). A parent's statutorily offensive conduct is often intertwined with the best-interest determination. *Horvatich v. Texas Dep't of Protective & Regulatory Servs.*, 78 S.W.3d 594, 601 (Tex. App.—Austin 2002, no pet.).

In addition to the above evidence regarding Nuyen's conduct, the court heard the following evidence regarding the best-interest determination. According to Rothas, on August 27, 2009, one of Nuyen's three older children, L.N., made a report of sexual abuse by her caregiver John Mills. After investigation, Rothas claimed that the Department placed L.N., and Nuyen's two other children, with a grandparent. Shortly thereafter, Rothas asserted that the grandparent decided she could not handle the children, and the Department placed the children in foster care. Rothas claimed that Nuyen was in California at the time and unable to provide the children with a safe home. While in foster care, L.N. made an outcry of sexual abuse against Nuyen. Rothas testified that the Department made a finding of "reason to believe" that Nuyen had, in fact, sexually abused L.N. In total, Rothas claimed that Nuyen has been involved in six different CPS cases with "several reason to believe" findings implicating Nuyen in abuse or neglect of her children.

Accordingly, Rothas testified, E.N. was removed at birth and placed with a foster family, the Hollingsworths. Rothas claimed that E.N. has spent all but "[o]ne or two days" of her life with them. The Department plans for the Hollingsworths to adopt E.N. Rothas believed the Department's plan to keep E.N. with the Hollingsworths "would provide [E.N.] with the stability she needs now and in the future." Rothas claimed that she had visited the Hollingsworths' home frequently, that they have no other children, and that E.N. appeared comfortable with her foster family and they with her. Rothas stated that she had no doubt that E.N. was bonded to the Hollingsworths. Rothas agreed that it would be "an absolute trauma" to remove E.N. from their care.

Nuyen admitted that her parental rights to her other children were terminated, but denied the sexual abuse allegations against her. She did not know if E.N. was being "well taken care of" by her new foster family because she claimed that she was unable to speak with the caregivers. She did not believe that termination of her parental rights was in E.N.'s best interests. Nuyen believed that it would be possible for her to be attached to E.N. and E.N. to her. She felt that she was "physically and mentally able to provide for the child's needs." She stated, "I've tried and I miss my daughter very deeply; and I've done everything I can. And sometimes it feels that I'm hitting a brick wall, and I have tried, and I just want to be heard sometimes." M'Sadoques testified that he had never seen Nuyen be abusive with E.N. or any other children, that he did not doubt that Nuyen would like E.N. back, and that there would be no danger to E.N. if she were returned to Nuyen.

We conclude that the above evidence is legally and factually sufficient to support the finding that termination was in E.N.'s best interest. The court heard evidence that E.N. has bonded with her foster family, with whom she has lived for all but a few days of her life. Rothas testified to the foster family's ability to provide E.N. with a stable environment. She also testified to the

15

importance for infants to have "consistent contact" with their caregivers in order to bond. The court heard evidence that Nuyen made minimal efforts to accomplish such bonding. And, as we have already explained, the court heard considerable evidence regarding Nuyen's inability to provide E.N. with a safe home. The evidence disputing the finding that termination was in E.N.'s best interest consisted primarily of Nuyen denying or offering excuses for the allegations against her, restating her belief that she had done all that was asked of her, and expressing her love for E.N. Giving due consideration to the above evidence that the factfinder could reasonably have found to be clear and convincing, we cannot say that the disputed evidence renders the evidence supporting the best-interest finding legally or factually insufficient.

The evidence was legally and factually sufficient to support termination of Nuyen's parental rights. We overrule her sole issue.

## CONCLUSION

We affirm the termination order.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Rose

Affirmed on Motion for Rehearing

Filed:   August 23, 2012

16